**DANJAQ, S.A., Plaintiff–Appellant,**

**v.**

**PATHE COMMUNICATIONS CORPORATION; MGM–Pathe Communications Co.; Tracinda Corporation; Kirk Kerkorian; MGM/UA Communications Co., Defendants–Appellees.**

No. 91–55878.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1992.

Decided Nov. 12, 1992.

decline to dismiss any part of this appeal as moot.

Howard King, Gang, Tyre, Ramer & Brown, Los Angeles, Cal., for plaintiff-appellant.

Eric N. Landau, Christensen, White, Miller, Fink & Jacobs; and Howard Weitzman, Karen Randall, Mark A. Wooster and Lura L. Burton, Katten Muchin Zavis & Weitzman, Los Angeles, Cal., for defendants-appellees.

Before: FEINBERG,* GOODWIN and SCHROEDER, Circuit Judges.

SCHROEDER, Circuit Judge:

This appeal involves two arcane issues of subject matter jurisdiction that are of first impression in this Circuit. Both issues relate to the determination of a corporation's principal place of business for purposes of diversity jurisdiction. The first is whether alien corporations are subject to 28 U.S.C. § 1332(c), which states that a corporation is a citizen both of its place of incorporation *and* the location of its principal place of business. We agree with the district court that an alien corporation, like a domestic corporation, is a citizen of both.

The second issue is whether the activities of a subsidiary corporation—not a party to the litigation—should be considered to determine the principal place of business of

---

* Honorable Wilfred Feinberg, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

the parent. We hold that a subsidiary's activities should not be considered for this purpose, at least absent a showing that the subsidiary is merely an alter ego of its parent.

The final issue is to determine the principal place of business of Plaintiff–Appellant Danjaq, S.A., a Swiss corporation. We conclude the district court correctly determined that place to be California, where appellant's business activities are conducted. Switzerland, where the corporate offices are located, serves merely as Appellant's administrative headquarters. We affirm.

### FACTUAL BACKGROUND

Danjaq is engaged in the development and production of motion pictures involving James Bond. In 1962, Danjaq and United Artists ("UA"), later succeeded by MGM/UA ("MGM"), entered into a Distribution Agreement whereby the latter was granted the exclusive commercial rights to the Bond movies.

Danjaq is incorporated in Switzerland, where its sole director, Gerald Schlaeppi, resides. Schlaeppi admittedly knows little about the film business and serves as a director of some fifteen other corporations. Laussane is the site of all Danjaq board of director and stockholder meetings, and is the location of all administrative records. All of Danjaq's financial transactions take place in Switzerland, including the payment of Swiss taxes.

Since 1986, Danjaq's sole shareholders have been Albert and Dana Broccoli. The Broccolis have resided in Los Angeles, California for over twenty years. Albert Broccoli co-founded Danjaq and is the principal decisionmaker for the development of the Bond films. Broccoli maintains an office in the MGM building in Culver City, California.

Much of the actual production of the Bond films is carried on by Eon Productions, Ltd. ("Eon"), which is based in London, England. Eon oversees the filming of the motion pictures, a duty that often takes it to various parts of the world depending upon the script. Generally, the final editing is completed by Eon in London.

In 1990, MGM was acquired by Pathe Communications, resulting in the formation of MGM–Pathe Communications ("MGM–Pathe"). Danjaq brought this action alleging breach of contract, breach of fiduciary duty, conspiracy to do the same, and copyright infringement. Specifically, Danjaq charged that the defendants were licensing the Bond movies in a manner contrary to the terms of the Distribution Agreement so as to help finance Pathe's acquisition of MGM.

The district court ruled that it had no jurisdiction to hear the first three claims because of a lack of diversity between the parties. The district court also held that the copyright claim against Pathe was meritless. *Danjaq, S.A. v. MGM/UA Communications Co.,* 773 F.Supp. 194 (1991). Danjaq having abandoned the copyright claim, the only issue on appeal is whether the district court properly concluded jurisdiction was absent. There is no dispute that defendants' citizenship for diversity purposes is California. Thus, if Danjaq is found to be a citizen of California, then diversity is destroyed and jurisdiction does not exist.

### DOES 28 U.S.C. § 1332(c) APPLY TO ALIEN CORPORATIONS?

The first question we must consider is whether an alien corporation has dual citizenship for purposes of diversity jurisdiction. Danjaq contends that the diversity statute, in so far as it defines a corporation's citizenship as the place of incorporation and the location of its principal place of business, does not apply to alien corporations. The district court rejected this argument and we agree.

Before 1958, an alien corporation was considered a citizen solely of the foreign state in which it was incorporated for purposes of diversity jurisdiction. *See, e.g., National S.S. v. Tugman,* 106 U.S. 118, 1 S.Ct. 58, 27 L.Ed. 87 (1882). In that year, Congress amended the diversity statute by adding the following provision:

[A] corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.

28 U.S.C. § 1332(c). The question presented is whether § 1332(c) applies to alien corporations.

The first case to decide whether § 1332(c) applies to alien corporations was *Eisenberg v. Commercial Union Assurance Co.*, 189 F.Supp. 500 (S.D.N.Y.1960). The *Eisenberg* court held that § 1332(c) does not apply to alien corporations. The court reasoned that because that provision used a capital "S" to spell "State," Congress was referring to a state of the United States and not a foreign state. This was so, the court explained, because an earlier provision of the statute used a small "s" when referring to "foreign states." *Id.* at 502; *see also* James W. Moore and Donald T. Weckstein, *Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited*, 77 Harv.L.Rev. 1426, 1435 (1964) ("There was no explicit congressional consideration of the effect of the amendment on alien corporations, and the text of the amendment suggests that this doctrine remains unaltered.").

The only two federal courts of appeals to entertain this issue have reached the opposite conclusion, holding instead that the statute does apply to alien corporations. *See Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553 (11th Cir.1989); *Jerguson v. Blue Dot Investment Co.*, 659 F.2d 31 (5th Cir.), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1981). Not only is the clear trend of authority in this direction,[1] but this approach better comports with Congress' reasons for enacting the 1958 amendment. Specifically, this amendment is based on the premise that an otherwise local corporation should not be able to invoke federal jurisdiction merely because it is incorporated in another state. Congress thus sought to curb the abuses of the diversity statute, which was enacted originally to protect foreign corporations from local bias. As the Senate report explained:

This fiction of stamping a corporation a citizen of the State of its incorporation has given rise to the evil whereby a local institution, engaged in a local business and in many cases locally owned, is enabled to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State.... This circumstance can hardly be considered fair because it gives the privilege of a choice of courts to a local corporation simply because it has a charter from another State, an advantage which another local corporation that obtained its charter in the home state does not have.

The underlying purpose of diversity of citizenship legislation ... is to provide a separate forum for out-of-State citizens against the prejudices of local courts and local juries by making available to them the benefits and safeguards of the Federal courts. Whatever the effectiveness of this rule, it was never intended to extend to local corporations which, because of a legal fiction, are considered citizens of another State....

S.Rep. No. 1830, 85th Cong., 2d Sess. 4 (1958). Given Congress' reasons, logic dictates that there be no distinction drawn between those corporations incorporated in a state of the United States and those incorporated in a foreign country for purposes of § 1332(c).

## MAY A SUBSIDIARY'S ACTIVITIES BE CONSIDERED TO DETERMINE ITS PARENT'S PRINCIPAL PLACE OF BUSINESS?

█ In order to determine where Danjaq's principal place of business is located, the following threshold question must be addressed: Should the activities of Danjaq's subsidiary Eon be considered to determine Danjaq's principal place of business? This issue is one that has been addressed by only a few courts.

---

**1.** *See, e.g., Carmania Corp. v. Hambrecht Terrell Int'l,* 758 F.Supp. 896, 898 (S.D.N.Y.1991); *Continental Motion Pictures v. Allstate Film Co.,* 590 F.Supp. 67 (C.D.Cal.1984). *See generally* 13B Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3628 (2d ed. 1984 & Supp.1992).

Appellant argues that because Eon performs the lion's share of producing the Bond films, its principal place of business, London, is also Danjaq's principal place of business. We affirm the district court's contrary conclusion that Danjaq's principal place of business is where its own activities, not Eon's, are centered. Absent a showing that the subsidiary is merely an alter ego of its parent corporation, there is no justification for ignoring the separate corporate structures and looking to the subsidiary's activities to determine the parent's principal place of business.

Many courts have addressed the converse of the situation before us today: whether a parent's citizenship can be imputed to the subsidiary for purposes of determining the subsidiary's principal place of business. The general rule derived from these cases is that "in a suit involving a subsidiary corporation, the court looks to the state of incorporation and principal place of business of the subsidiary, and not its parent." 1 James W. Moore et al., *Moore's Federal Practice* ¶ 0.77[2.–5] (2d ed. 1992); *see also Schwartz v. Electronic Data Sys., Inc.*, 913 F.2d 279 (6th Cir.1990); *U.S.I. Properties Corp. v. M.D. Constr. Co.*, 860 F.2d 1 (1st Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989). The only recognized exception to this rule is where the subsidiary is the alter ego of the parent corporation. Under these circumstances, courts view the formal separateness between the two corporations as merely a legal fiction. *See* 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3625, at 635–36 (2d ed. 1984); *Burnside v. Sanders Ass'n, Inc.,* 507 F.Supp. 165, 166 (N.D.Tex.1980), *aff'd,* 643 F.2d 389 (5th Cir.1981).

Appellant urges us to take a different approach on the facts before us. Admittedly, the situation in this case is different. Here we deal with whether a subsidiary's activities may be considered to determine the principal place of business of the parent. However, Appellant offers no reason why this inquiry should lead to a different result. We therefore hold that the citizenship of a parent is distinct from its subsidiary where, as here, there is no evidence of an alter ego relationship.

In the only recent case of which we are aware involving a parent's citizenship, the D.C. Circuit refused to consider a subsidiary's activities. *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114 (D.C.Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991). Moreover, the relationship between the parent and subsidiary was much closer in *Pyramid Securities* than in this case. Specifically, the D.C. Circuit ruled that a parent does not take its subsidiary's citizenship for jurisdictional purposes, even where the parent is the alter ego of its subsidiary and is being sued for acts of the subsidiary. The court relied heavily on the fact that courts generally treat a parent and subsidiary as distinct from one another when addressing efforts to attribute a parent's citizenship to its subsidiary. *Id.* at 1120. The court thus concluded that "[t]he [diversity] statute suggests no attribution rule in either case." *Id.; see also Lugo–Vina v. Pueblo Int'l, Inc.,* 574 F.2d 41 (1st Cir.1978) (district court erred when it considered subsidiary's operations for purposes of determining parent's principal place of business).

Appellant's arguments to the contrary are unpersuasive. Appellant relies principally on the Third Circuit case of *Kelly v. United States Steel Corp.*, 284 F.2d 850 (3rd Cir.1960). But Appellant misinterprets the holding in that case. The Third Circuit found that the principal place of business of the defendant coincided with the place where many of its subsidiaries were located. However, the Third Circuit's decision did not turn on the activities of the subsidiaries. Instead, the court looked to where the defendant's Operation Policy Committee, which made major policy decisions and conducted the daily operations of the company, was located. *See also Douglas v. Ryder Truck Lines, Inc.,* 597 F.Supp. 1100 (E.D.Pa.1984) (location of holding company's broad policy decisions dispositive, relying on *Kelly* ). *Kelly* is therefore consistent with our conclusion that the activities of a subsidiary should not be considered to determine its parent's principal place of business where there is no showing of an alter ego relationship. Because

Danjaq does not allege that it is the alter ego of Eon, we decline to reach that issue. *Cf. Pyramid Securities, supra.*

## DANJAQ'S PRINCIPAL PLACE OF BUSINESS

■ Having determined that the diversity statute applies to Danjaq and that the activities of Eon may not be considered, we turn now to Danjaq's principal place of business. The district court found that Danjaq's principal place of business is Los Angeles, California. We agree.

This Circuit recently outlined the tests available to a court to determine a corporation's principal place of business and under what circumstances each should be applied. *Industrial Tectonics, Inc. v. Aero Alloy,* 912 F.2d 1090 (9th Cir.1990). The "nerve center" approach looks to the corporation's headquarters as the principal place of business. The "place of operations" test focuses on the state where a substantial portion of the corporation's business is located. As to choosing the appropriate test, the *Tectonics* court stated:

> [W]here a majority of a corporation's business activity takes place in one state, that state is the corporation's principal place of business, even if the corporate headquarters are located in a different state. The "nerve center" test should be used only when no state contains a substantial predominance of the corporation's business activities.

*Id.* at 1094.

To the extent that there is a general rule to be derived from the two approaches, it is "that the bulk of corporate activity, as evidenced by the location of daily operating and management activities, governs the choice of a principal place of business." Wright, Miller & Cooper, *supra,* § 3635, at 625; *see also Industrial Tectonics,* 912 F.2d at 1093 n. 3. Using this as a guidepost, it is obvious that Danjaq's principal place of business is California.

Danjaq engages in the development and production of the Bond films. There can be no dispute that Albert Broccoli is the central figure in the development of the Bond films. The district court made the following findings: Broccoli makes virtually every important decision for Danjaq; he and his wife are the sole shareholders and live in Los Angeles; Broccoli maintains an office in Culver City, California; and discussions and negotiations with MGM take place in Los Angeles several times each year.

Appellant offers both Switzerland and London as locations where Danjaq conducts more business than in California. Switzerland, however, is home only to Danjaq's administrative offices and ministerial duties. There are no decisions made in Switzerland that deal with the policy and direction of the corporation. Further, London cannot qualify as the principal place of business. Although most of the actual production of the Bond films occurs there, all activity is carried on by Danjaq's subsidiary Eon. For the reasons discussed above, Eon cannot be considered for purposes of determining Danjaq's principal place of business.

California is the principal place of business of Danjaq. Given the lack of diversity between the parties, the district court correctly dismissed the state law claims.

AFFIRMED.