ASTRA OIL TRADING NV, Plaintiff,

v.

PRSI TRADING COMPANY LP, Defendant.

No. 08 CV 10467(NRB).

United States District Court, S.D. New York.

June 23, 2011.

Gerald A. Novack, Esq., David S. Versfelt, Esq., Scott Newman, Esq., Catherine A. LaRose, Esq., K & L Gates LLP, New York, NY, for Plaintiff.

William M. Katz, Jr., Esq., Thompson & Knight LLP, Dallas, TX, for Defendant.

### MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Astra Oil Trading N.V. ("AOT") has brought two actions before this Court against defendant PRSI Trading Company L.P. ("PRSI Trading") seeking indemnification in the amount of approximately $156 million, which AOT alleges was paid under its obligation as a guarantor of PRSI Trading's credit facility. In the first action, 08 Civ. 10467, this Court granted plaintiff's motion for pre-judgment attachment of funds in two PRSI Trading bank accounts pursuant to Sections 6201 and 6212 of the New York Civil Practice Law and Rules and Rule 64 of the Federal Rules of Civil Procedure. *See Astra Oil Trading N.V. v. PRSI Trading Co. L.P.*, No. Civ. 10467(NRB), 2008 WL 5429821 (S.D.N.Y. Dec. 23, 2008). Plaintiff's second action, 10 Civ. 6067, seeks an identical attachment of the same accounts in the event that the first action is dismissed. Defendant now moves to dismiss both actions for lack of subject matter jurisdiction and to vacate the existing attachment. In addition, defendant seeks an award of damages and attorneys' fees for wrongful attachment or, alternatively, an increase in the amount of plaintiff's attachment bond. For the reasons set forth below, defendant's motion is granted in part and denied in part.

## BACKGROUND [1]

In 2006, plaintiff and Petrobras America, Inc. ("PAI") formed the defendant partnership, PRSI Trading Company. Initially the partnership was comprised of two entities wholly-owned by plaintiff ("the Astra partners") and two entities wholly-owned by PAI ("the PAI partners"). Disputes between plaintiff and PAI led the parties to begin an arbitration in June 2008.

In July 2008, the Astra partners sought to exercise put-option rights under the partnership agreement against the PAI partners. This would have had the effect of forcing a buyout of the Astra partners' ownership interests, leaving the PAI partners with complete ownership of defendant. On October 24, 2008, the arbitration panel upheld the validity of plaintiff's exercise of its put-option rights, but deferred a decision on when and how much PAI and the PAI partners would be required to pay until a final hearing to commence in February 2009.

At the time, plaintiff and PAI were guarantors of defendant's $500 million credit facility from BNP Paribas which was set to expire on October 31, 2008. Defendant allowed the credit facility to expire without fully repaying BNP Paribas. As a result, on November 3, 2008 the guarantors (both plaintiff and PAI) were required to make guarantee payments to BNP Paribas of approximately $156 million each. Because the arbitration panel's October 24, 2008 ruling assured plaintiff that it would eventually recover the price of its put-option rights under a pre-determined formula at the conclusion of arbitration, plaintiff raised a counterclaim seeking immediate reimbursement of the $156 mil-

lion guarantee payment it had made. The arbitration panel denied the interim expedited relief without prejudice to plaintiff recovering the $156 million claim at the conclusion of the final hearing.

On December 3, 2008, plaintiff filed its first action in this Court, 08 Civ. 10467, seeking attachment of defendant's funds and indemnification in the amount of $156 million. At oral argument, counsel for defendant assured the Court that defendant did not dispute that an amount greater than $156 million was owed to "Astra" but professed confusion as to the exact amount and which entity within plaintiff's corporate structure to pay. (Versfelt Decl. Ex. 1 at 31–35.) Defense counsel also emphasized that the indemnification claim would shortly be resolved in the ongoing arbitration. (*Id.* at 36:7–16, 38:6–14.)

On December 23, 2008, following briefing and oral argument, we granted plaintiff's motion for an order of attachment. *See Astra Oil Trading N.V. v. PRSI Trading Co. L.P.*, No. 08 Civ. 10467(NRB), 2008 WL 5429821 (S.D.N.Y. Dec. 23, 2008). Thereafter, defendants moved to dismiss the action for lack of diversity jurisdiction. On April 6, 2009, we denied defendant's motion without prejudice, predicting that the arbitration panel's forthcoming final determination would "obviate the need for our attachment order." *Astra Oil Trading N.V. v. PRSI Trading Co. L.P.*, No. 08 Civ. 10467(NRB), 2009 WL 928672, at *4 (S.D.N.Y. April 6, 2009).

On April 10, 2009, the arbitration panel's Final Award of Arbitrators was issued, holding that AOT was entitled to indemnification from the PAI partners for the $156 million guarantee payment. (Petro-

---

1. The history and facts of the underlying dispute in this case are set forth in greater detail in two previous opinions. *See Astra Oil Trading NV v. PRSI Trading Co. LP*, No. 08 Civ. 10467(NRB), 2008 WL 5429821 (S.D.N.Y. Dec. 23, 2008); *Astra Oil Trading NV v. PRSI Trading Co. LP*, No. 08 Civ. 10467(NRB), 2009 WL 928672 (S.D.N.Y. April 6, 2009).

nio Decl. Ex 4 at 51.) The panel directed the PAI partners to pay this amount, plus interest, to plaintiff on or before April 27, 2009. (*Id.*) The panel also directed the Astra partners to transfer their ownership interests in the defendant partnership to the PAI partners on or before April 27, 2009. (*Id.* at 58.)

Plaintiff alleges that the Astra partners transferred their interests as directed, but that the PAI partners refused to pay. On April 28, 2009, plaintiff brought an action to enforce the arbitration award in federal court in the Southern District of Texas. The district court initially ruled in favor of plaintiff on the merits, confirming the arbitration award, but on a motion for reconsideration the action was dismissed for lack of subject matter jurisdiction. *See Astra Oil Trading N.V. v. Petrobras Am. Inc.*, 718 F.Supp.2d 805 (S.D.Tex. Mar.10, 2010), *vacated on reh'g, Astra Oil Trading N.V. v. Petrobras Am. Inc.*, 2010 WL 3069793 (S.D.Tex. Aug. 4, 2010).

Shortly after the Texas district court's dismissal, defendant returned to this Court and renewed its motion to dismiss the indemnification action for lack of subject matter jurisdiction. On August 12, 2010, plaintiff filed its second action against defendant, 10 Civ. 6067, nearly identical to the first, and informed the Court that this was done "as a precaution merely in order to continue preserving the status quo." (Pl.'s 2d Compl. 3 ¶ 4.)

### DISCUSSION

In its first action, 08 Civ. 10467, plaintiff has invoked subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), which grants federal courts jurisdiction over actions between "citizens of a State and citizens or subjects of a foreign state." Plaintiff asserts that it is a citizen or subject of Netherlands, and defendant is a limited partnership whose members are citizens of Delaware, Texas, Nevada, and California. Defendant objects that plaintiff's principal place of business is in fact California, making plaintiff a citizen of that state pursuant to 28 U.S.C. § 1332(c) and thus destroying complete diversity.

### I. Subject Matter Jurisdiction—Application of § 1332(c) to Alien Corporations

The diversity statute, 28 U.S.C § 1332, was amended in 1958 to add a subsection (c) dealing with the citizenship of corporations. 28 U.S.C. § 1332(c) provides in pertinent part:

> For the purposes of this section and section 1441 of this title, a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . .

Congress intended this amendment to correct a perceived abuse "whereby a local institution, engaged in a local business and in many cases locally owned, is enabled to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State." S.Rep. No. 85–1830, at 4 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3099, 3101–02 (citing *Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681 (1928) in which plaintiff, a Tennessee corporation, gained access to federal court by dissolving itself in Tennessee and reincorporating in Kentucky to create diversity). The result under § 1332(c) is the well-established system of dual-citizenship for the many corporations which are incorporated by one state of the United States ("U.S. State"), such as Delaware, but have their principal place of business in a different U.S. State.

Prior to 1958, alien corporations were treated solely as citizens or subjects of a

foreign state, without regard to their principal place of business. *See Steamship Co. v. Tugman*, 106 U.S. 118, 121, 1 S.Ct. 58, 27 L.Ed. 87 (1882) ("[A] corporation of a foreign state is, for purposes or jurisdiction in the courts of the United States, to be deemed, constructively, a citizen or subject of such state."). After Congress added § 1332(c), however, the difficult question arose as to whether this subsection applied to a corporation incorporated by a foreign state which nonetheless had its principal place of business in a U.S. State.

The diversity statute clearly distinguishes between foreign states and U.S. States, using the lowercase term 'states' to refer to foreign states and the capitalized term 'States' to refer to U.S. States.[2] Alien corporations create an interpretive difficulty because the initial clause of § 1332(c)(1), which deems a corporation to be a "citizen of any State by which it has been incorporated," may be read to refer only to a corporation which has been incorporated by at least one U.S. State. On this interpretation, it is far from clear how the pronouns of the second clause of § 1332(c)(1), which says "the State where *it* has *its* principal place of business" (emphasis added), can be interpreted to refer to a corporation not referred to in the first clause, *i.e.* an alien corporation. Thus a literal interpretation renders § 1332(c) inapplicable to alien corporations.

The first district court to confront this difficulty found it insurmountable, concluding that "[u]nless a corporation is incorporated by a State of the United States it will not be deemed a citizen of the State where it has its principal place of business." *Eisenberg v. Commercial Union Assurance Co.*, 189 F.Supp. 500, 502 (S.D.N.Y.1960). *Eisenberg* was influential, leading a number of courts within this

District to accept the view that § 1332(c) did not apply to foreign corporations. *See Chemical Transp. Corp. v. Metropolitan Petroleum Corp.*, 246 F.Supp. 563, 567 (S.D.N.Y.1964); *Mazzella v. Pan Oceanica A/S Panama*, 232 F.Supp. 29, 31 n. 1 (S.D.N.Y.1964); *Tsakonites v. Transpacific Carriers Corp.*, 246 F.Supp. 634 (S.D.N.Y.1965), *aff'd*, 368 F.2d 426 (2d Cir. 1966); *Union Marine & General Ins. Co. v. Am. Export Lines, Inc.*, 274 F.Supp. 123, 125 n. 1 (S.D.N.Y.1966); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 477 F.Supp. 615 (S.D.N.Y.1979), *modified on other grounds*, 629 F.2d 786 (2d Cir.1980).

The Second Circuit has never decided whether § 1332(c) applies to alien corporations. In dictum, it has "suggested that alien corporations are not citizens of the state in which they have their principal place of business," *Corporacion Venezolana de Fomento v. Vintero Sales*, 629 F.2d 786, 790 (2d Cir.1980) (citing *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 628 n. 5 (2d Cir.1976)). However, in *Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097 (2d Cir.1986), the Second Circuit applied a provision of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(b), which specifically incorporates § 1332(c), to find that the Canadian National Railway was not a citizen of a U.S. State because its principal place of business was in Canada. At least one court has concluded that *Bailey* "implicitly but unambiguously end[ed] the debate in this circuit over § 1332(c)" by applying the statute to an alien corporation. *Schneider v. Bahama Cruise Line, Inc.*, 664 F.Supp. 80, 82 (S.D.N.Y.1987); *but see Clifford Corp., N.V. v. Ingber*, 713 F.Supp. 575, 576 n. 1 (S.D.N.Y.1989) (rejecting the view that *Bailey* implicitly "assumed" the

---

**2.** In addition, § 1332(e) defines the term 'States' to include "the Territories, the District of Columbia, and the Commonwealth of Puerto Rico."

applicability of § 1332(c) to alien corporations).

■ Because *Bailey* involved a different statute, the Foreign Sovereign Immunities Act, with its unique purposes, we cannot conclude that it resolved the question of whether § 1332(c) is directly applicable to alien corporations. In cases since *Bailey*, the Second Circuit has clearly rejected one possible interpretation of § 1332(c) as erroneous: the statute does not displace the pre-existing rule that alien corporations are aliens and does not confer sole-citizenship in the U.S. State of an alien corporation's principal place of business. *See Int'l Shipping Co. v. Hydra Offshore*, 875 F.2d 388, 391 (2d Cir.1989) (upholding Rule 11 sanctions against attorney for arguing alien corporation's sole citizenship was U.S. State of its principal place of business), *cert. denied*, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989); *see also Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579 (2d Cir.2002); *Franceskin v. Credit Suisse*, 214 F.3d 253 (2d Cir.2000). These cases imply that *if* § 1332(c) is applicable to alien corporations, then it must confer dual-citizenship in *both* the foreign state of incorporation *and* the U.S. State of the corporation's principal place of business.

Other Circuits which have reached the issue have agreed, contrary to *Eisenberg*, that § 1332(c) applies to foreign corporations. *See Danjaq, S.A. v. Pathe Commc'ns Corp.*, 979 F.2d 772, 773–74 (9th Cir.1992); *Vareka Invs., N.V. v. Am. Inv. Props., Inc.*, 724 F.2d 907, 909 (11th Cir. 1984), *cert. denied*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984); *Jerguson v. Blue Dot Inv., Inc.*, 659 F.2d 31, 35 (5th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *see also Slavchev v. Royal Caribbean Cruises, Ltd.*, 559 F.3d 251, 254 (4th Cir.2009) (dictum) ("[W]e conclude that a corporation with its principal place of business in one of the United States and incorporated under the laws of a foreign state has dual citizenship for purposes of diversity jurisdiction"). Most[3] have adopted the rationale first articulated by the Fifth Circuit in *Jerguson*. In that case, the Fifth Circuit held that *Eisenberg*'s analysis must be rejected because "[r]eading the word 'State' to refer only to an American state ... does not necessitate the conclusion that the principal place of business part of section 1332(c) cannot be applied to alien corporations." *Jerguson*, 659 F.2d at 35. It also concluded that applying the statute to alien corporations would effectuate Congress's policy of limiting diversity for entities which had no need for federal court protection against bias in the U.S. State where they had chosen to locate their principal place of business. *Id.; accord Danjaq*, 979 F.2d at 774. The Supreme Court has declined to rule on the issue, but has noted the agreement among the Circuits just described. *See JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 98 n. 3, 122 S.Ct. 2054, 153 L.Ed.2d 95 (2002).

■ Thus, we find no controlling authority on the question before us, but a number of persuasive opinions, some following *Eisenberg*, and others following *Jerguson*. In recent years, the majority of courts within this District to have considered the issue have adopted the *Jerguson* analysis. *See Phoenix Four, Inc. v. Stra-*

---

**3.** The exception is the Fourth Circuit in *Slavchev*, 559 F.3d at 254, which gave no explanation for its conclusion that a defendant alien corporation had dual-citizenship, nor why that conclusion would be necessary to hold that diversity was lacking with the alien plaintiff. *Cf. Creaciones Con Idea, S.A. de C.V. v. Mashreqbank P.S.C.*, 232 F.3d 79, 82 (2d Cir. 2000); *Int'l Shipping Co. v. Hydra Offshore*, 875 F.2d 388, 391 (2d Cir.1989).

*tegic Res. Corp.*, 446 F.Supp.2d 205, 214 (S.D.N.Y.2006) (collecting cases and noting "the weight of authority in this District has shifted in favor of *Jerguson* "). We too find that approach to be superior to the logic of *Eisenberg,* which hinged on the premise that the first clause of § 1332(c)(1) must have as its referent a *particular domestic* corporation in order for the second clause to be meaningful. *See Eisenberg,* 189 F.Supp. at 502 ("Subdivision (c), therefore, in dealing with the *place of incorporation* refers only to a corporation incorporated in a State of the United States.") To the contrary, we find that the use of the indefinite term 'any' in the first clause suggests that the corporation referred to may be incorporated in one, many[4], *or no* U.S. States. This is confirmed by the contrasting use of the definite term 'the' in the second clause, suggesting that a corporation must have only one principal place of business. When that principal place of business is within a U.S. State, then § 1332(c) can be applied whether the corporation is an alien corporation or not.

■ Thus the *Jerguson* analysis resolves an apparent statutory ambiguity by maintaining the applicability of the statute to alien corporations which have their principal place of business in the United States. The resulting rule reflects the legislative intent behind § 1332(c) by treating all corporations—whether alien or domestic—which have their principal place of business in a U.S. State as dual-citizens of the place where they are incorporated and their principal place of business.

Therefore, we hold that plaintiff's incorporation in Netherlands does not preclude it from being deemed a citizen of California as well, if its principal place of business is located in California.

■ To determine a corporation's principal place of business, the Supreme Court has adopted the "nerve center" test, which requires courts to look to the place where corporate officers direct, control, and coordinate the corporation's activities. *See Hertz Corp. v. Friend,* —— U.S. ——, 130 S.Ct. 1181, 1192, 175 L.Ed.2d 1029 (2010). In a separate proceeding in the Southern District of Texas, Judge Werlein applied this test to the plaintiff, finding that California was its principal place of business. *See Astra Oil Trading NV v. Petrobras Am., Inc.,* No. H–09–1274, 2010 WL 3069793 *8 (S.D.Tex. Aug. 4, 2010). Defendant now argues that collateral estoppel, or issue preclusion, bars the plaintiff from relitigating the identical issue before this Court. Because plaintiff had a full and fair opportunity to litigate the issue of its principal place of business in the prior proceeding, we agree.[5] Plaintiff is therefore deemed to be a citizen of California.

## II. Post–Filing Change in Defendant Partnership

■ Because defendant is a limited partnership, diversity jurisdiction in a suit against it depends on the citizenship of all of its members. *See Carden v. Arkoma,* 494 U.S. 185, 195–96, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). On December 3, 2008,

---

**4.** Related interpretive issues arise when a corporation is incorporated in more than one state. *See* 13F Charles Alan Wright et al., *Federal Practice and Procedure* § 3626 (3d ed.2011).

**5.** We recognize that the Texas district court decided the issue of plaintiff's principal place of business under a provision of the Federal

Arbitration Act, 9 U.S.C. § 202, rather than the diversity statute, 28 U.S.C. § 1332(c). Even if the decision lacked issue-preclusive effect for that reason, we find nothing in Judge Werlein's application of the *Hertz* test to the facts of this case with which to disagree, and would reach the identical result.

the date the first action, 08 Civ. 10467, was filed, two of the members of the defendant partnership were the Astra partners, Astra GP, Inc. and Astra Tradeco LP LLC, entities wholly-owned by the plaintiff. Because these entities were formed in California, they were undoubtedly citizens of California and their presence as members of the defendant partnership at the time of filing is sufficient to destroy complete diversity.

However, the defendant partnership has undergone a significant post-filing change of ownership. On April 27, 2009, in compliance with the Final Award of Arbitrators, the Astra partners transferred their ownership interests in the partnership to the PAI partners. This transfer eliminated the only citizens of California from the partnership, rendering defendant completely diverse from plaintiff. On August 12, 2010, plaintiff filed its second action, 10 Civ. 6067, against the same defendant (now comprised of only the two PAI partners). Plaintiff's second action was substantively identical to the first, except for the addition of an alternative jurisdictional provision, 28 U.S.C. § 1332(a)(1), which grants jurisdiction over actions between "citizens of different States." Plaintiff argues that, on the date it filed its second action, even if it was a citizen of California, the defendant partnership's members were citizens of Texas and Delaware.

■ A post-filing change in citizenship cannot cure a lack of diversity at the time of filing. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004). Consequently, the ownership transfer on April 27, 2009, although it rendered defendant completely diverse from plaintiff, did not cure this Court's lack of subject matter jurisdiction over the first action, 08 Civ. 10467, filed on December 3, 2008. Thus defendant's motion to dismiss that action must be granted.

■ Plaintiff's second action, 10 Civ. 6067, does not suffer from the same jurisdictional defect, as it is undisputed that the parties were of diverse citizenship when it was filed on August 12, 2010. Nonetheless, defendant argues that the second action must also be dismissed because it was filed while the first action remained pending. Defendant cites *Curtis v. Citibank, N.A.*, 226 F.3d 133 (2d Cir.2000), for the proposition that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Id.* at 139.

However, plaintiff has expressed no desire to maintain both actions, much less any right to do so. Rather, the Court has been apprised by plaintiff from the very start that the only purpose of the second action was to ensure that defendant's assets located in New York remain under attachment in the event the first action must be dismissed. The present case is therefore distinguishable from one in which a duplicative filing was concealed from a district court or intended to circumvent procedural rules. *See, e.g., Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 224 (7th Cir.1993) (second suit filed to avoid dismissal for untimely service in first suit); *Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir.1985) (second suit filed without notifying court or opposing counsel it was related to first suit); *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir.1977) (second suit filed to evade waiver of right to jury trial in first suit).

As the parties and the Court are well-aware, the underlying issues in this dispute have already been decided by an arbitration panel. On April 10, 2009, a Final Award of Arbitrators held that plaintiff was entitled to indemnity for the $156 million guarantee payment made to BNP

Paribas, and ordered the PAI partners to pay this amount on or before April 27, 2009. (Petronio Decl. Ex. 4 at 51.) Rather than comply with the award, PAI and the PAI partners have instead continued to raise objections that the arbitrators exceeded their authority, that more discovery was necessary, and that plaintiff must produce certain documents. All of these arguments were rejected as meritless by the arbitration panel and by a federal court, *see Astra Oil Trading N.V. v. Petrobras America, Inc.*, 718 F.Supp.2d 805, 813–815 (S.D.Tex.2010), although the latter decision was later vacated for lack of subject matter jurisdiction. *See Astra Oil Trading N.V. v. Petrobras America, Inc.*, 2010 WL 3069793 (S.D.Tex.2010). Subsequently, the arbitration award was again confirmed by a Texas state court, but PAI has chosen to appeal this decision. *See Astra Oil Trading N.V. v. Petrobras America, Inc.*, No. 2010–22326 (Tex.Dist. Ct. Dec. 10, 2010) (order confirming arbitration award), *appeal docketed*, No. 01–11–00073–CV (Tex.App. Jan. 25, 2011). Most recently, in a separate Texas state court action against defendant, plaintiff was granted summary judgment on the same $156 million guarantee payment claim at issue in the present case. *See Astra Oil Trading N.V. v. PRSI Trading Co., L.P.*, No. 2009–25450, 2011 WL 3204543 (Tex.Dist.Ct. Mar. 10, 2011) (order granting summary judgment on indemnification claim).

The result, after more than two years of litigation, is that defendant continues to delay and obstruct plaintiff's effort to be repaid a sum it is indisputably owed. Defendant's recalcitrance is especially egregious since over two years ago, at the December 9, 2008 oral argument before this Court, defendant acknowledged that it owed indemnification for the $156 million guarantee payment made by plaintiff to BNP Paribas. (Versfelt Decl. Ex. 1 at 35–37.) As the Second Circuit noted in *Curtis,* "[t]he complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion." 226 F.3d at 138 (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Given defendant's conduct thus far, we conclude that equity strongly favors permitting the plaintiff to pursue a second action before this Court, although the first action must be dismissed for lack of subject matter jurisdiction. Defendant's motion to dismiss the second action, 10 Civ. 6067, is therefore denied.

**III. Standing of Corporate Entity to Seek Indemnification for Guarantee Payment Made Through a Wholly–Owned Subsidiary**

Defendant also argues that plaintiff lacks standing to pursue an indemnification claim because the $156 million payment to BNP Paribas was made by a subsidiary of plaintiff. Under the doctrine of constitutional standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the challenged conduct of defendant and is likely to be redressed by a favorable court decision in order to bring suit in the federal courts. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In addition, the doctrine of prudential standing greatly limits a plaintiff's ability to assert the rights and interests of third parties. *See United Food and Commercial Workers v. Brown Group,* 517 U.S. 544, 557, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

Defendant's argument appears to be that plaintiff's subsidiary, and not plain-

tiff, was the party actually injured by defendant's unwarranted refusal to repay its guarantor $156 million. The factual basis for defendant's argument is that the wire transfer of funds for the guarantee payment originated from a bank account in the name of plaintiff's wholly-owned subsidiary, rather than an account in plaintiff's own corporate name. Plaintiff responds that it obtained the funds to make the payment through an intercompany loan from its subsidiary, and that this was a standard process for moving large amounts of money.

Although we recognize that it is ultimately plaintiff's burden to establish standing, defendant's misguided argument needs only to be stated to be rejected. It defies common sense to insist that a guarantor lacks standing to assert its common law right to indemnification from the obligor because the guarantor made its payment by directing that funds be transferred from its subsidiary's account. In addition, defendant cites no relevant case authority in support of this proposed holding.[6] Because it is undisputed that plaintiff was a guarantor of defendant's debt, and that a payment of $156 million was made to defendant's creditor from an account in the name of plaintiff's wholly-owned subsidiary, we find that plaintiff has standing to assert a claim for indemnification in the amount of its economic loss.

## IV. Vacatur and Damages

Under N.Y.C.P.L.R. 6212(e), a defendant is entitled to recover "all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if the defendant recovers judgment, or if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property." Defendant asserts that a finding of a lack of diversity jurisdiction over plaintiff's first action means that this Court has in effect finally decided that plaintiff was not entitled to the attachment, and consequently that defendant is entitled to damages of more than $17 million in statutory interest on the funds under attachment, as well as approximately $360,000 in attorneys' fees.

Plaintiff does not dispute that any attachment issued by a court lacking subject matter jurisdiction must be vacated. Rather, plaintiff argues that a second attachment should issue in its second action, 10 Civ. 6067, and that this would confirm that plaintiff is "finally entitled to an attachment" and cannot be held liable under the terms of § 6212(e). Plaintiff also suggests that vacatur of an attachment on merely "technical" grounds does not warrant an award of damages to defendant under § 6212(e).[7] *See Leslee Travel Inc. v. Amer. Coupon Exchange, Inc.,* 138 Misc.2d 901, 902, 525 N.Y.S.2d 773, 774 (N.Y.Civ.Ct.1988) ("Vacatur of attachment for a 'technical reason,' other than that plaintiff was not entitled to attachment, does not give rise to liability for damages under the statute.").

We find the reasoning set forth in our previous decision to continue the first attachment, *see Astra Oil Trading NV v. PRSI Trading Co. LP,* No. 08 Civ.

---

**6.** The only case cited by defendant involved a distinct cause of action by a trustee asserting subrogation, not a guarantor seeking indemnification. *See Bermuda Trust Co. v. Ameropan Oil Corp.,* 266 A.D.2d 251, 698 N.Y.S.2d 691 (2d Dep't 1999) (recognizing that a volunteer who pays is not entitled to subrogation).

**7.** The origin of this proposition appears to be The New York State Revision of the Civil Practice Act, 3rd and 4th Reports, Title 72 at 341 (Mar. 1, 1959), which stated that the language of § 6212(e) was adopted "in order to make clear that the undertaking is not to be used to pay the defendant if an attachment is vacated for merely technical defects."

10467(NRB), 2008 WL 5429821 (S.D.N.Y. Dec. 23, 2008), equally applicable to plaintiff's second action, 10 Civ. 6067, and supportive of the issuance of a second attachment. Indeed, the defendant's refusal to comply with the arbitration panel's April 2009 decision, a decision we had optimistically expected to "obviate the need for our attachment order," *Astra Oil Trading NV v. PRSI Trading Co. LP,* No. 08 Civ. 10467(NRB), 2009 WL 928672 (S.D.N.Y. April 6, 2009), has only confirmed that a second attachment will be necessary to maintain the status quo while the parties continue the litigation in Texas. Plaintiff's request for a second attachment substantively identical to the first will be granted, and the first attachment will then be vacated.[8]

 Having decided that an attachment will remain in place, we turn to the issue of defendant's entitlement to damages and attorneys' fees under § 6212(e). This issue is presented in a unique factual and legal context. We begin by observing that plaintiff's commencement of this action pursuant to this Court's diversity jurisdiction on the basis that it was a foreign corporation can only be described as a position taken in good faith. Under the law of this Circuit and the facts of this case, the citizenship status of Astra was unpredictable. Not only were there conflicting lines of case authority interpreting the diversity statute, as discussed above, but in addition, the factual basis for a determination of plaintiff's principal place of business was so uncertain as to subsequently lead to conflicting successive interpretations by Judge Werlein. *Compare Astra Oil Trading N.V. v. Petrobras Am. Inc.,* 718 F.Supp.2d 805· (S.D.Tex.2010) (finding that the European chairman and board of directors of plaintiff's parent corporation, Transcor, are the center of "overall direction, control, and coordination" in virtue of their authority over plaintiff's Californian CEO), *with Astra Oil Trading N.V. v. Petrobras Am. Inc.,* 2010 WL 3069793 (S.D.Tex. Aug. 4, 2010) (vacating previous order after finding plaintiff's CEO possesses "significant independent authority" to "actively manage" plaintiff as the "recognized corporate leader and central decision-maker"). Indeed, the legal standard upon which the determination of plaintiff's principal place of business was made was not decided by the Supreme Court until February 2010, fourteen months after plaintiff sought the first attachment in this Court. *See Hertz Corp. v. Friend,* —— U.S. ——, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010) (establishing the "nerve center" test for a corporation's principal place of business).

Moreover, before commencing the first action, plaintiff exercised put-option rights which would have extricated it from the ownership of defendant, and an arbitration panel had preliminarily upheld the validity of plaintiff's exercise of these rights. As we have previously noted, that exercise should have sufficed to make PAI the defendant's de facto owner. *See Astra Oil Trading N.V. v. PRSI Trading Co. L.P.,* 2009 WL 928672, at *3 (S.D.N.Y. April 6, 2009). However, a dispute over the sales price under a pricing formula in the partnership agreement resulted in the parties remaining in arbitration. While arbitration was pending, PAI and the PAI partners refused to pay plaintiff, and so kept plaintiff as at least a nominal partner in the defendant partnership, which PAI nonetheless controlled. It was plaintiff's nominal stake in the defendant and the

---

8. For the sake of clarity, we wish to stress our intention that there be no daylight between the vacatur of the first attachment and the issuance of the second. To accomplish this goal, the first attachment will be vacated only after the second attachment has issued.

legal clarifications discussed which resulted in the finding that diversity was lacking.[9]

In contrast to plaintiff's reasonable actions, defendant's actions cannot be viewed in a similar light. Despite having acknowledged years ago that defendant is indebted to plaintiff for more than the attached funds, defendant has resisted every effort by plaintiff to collect, as well as the efforts of this Court to bring the parties to an agreeable settlement, and instead has litigated every possible issue at every opportunity regardless of whether the issue was directed to the ultimate merits of the substantive controversy between the parties. Accordingly, for the reasons set forth in this opinion and in our previous decisions, we have found that plaintiff is entitled to an attachment. Thus, we cannot accept defendant's argument that, for the purposes of § 6212(e), it has been "finally decided that the plaintiff was not entitled to an attachment of the defendant's property."

In response to defendant's argument, plaintiff also urges the Court to adopt the view that a lack of complete diversity in this case was merely a "technical" ground for dismissal, and therefore § 6212(e) is inapplicable. *Cf. Minskoff v. Fidelity & Cas. Co.*, 28 A.D.2d 85, 281 N.Y.S.2d 410 (1st Dep't 1967) (upholding award of damages following *forum non conveniens* dismissal and vacatur), *aff'd*, 23 N.Y.2d 706, 296 N.Y.S.2d 151, 243 N.E.2d 755 (1968). As a general matter, a federal court's obligation to assure that it has subject matter jurisdiction is of far greater moment than a mere technicality. However, the uncertain state of the law confronting plaintiff at the time it filed suit, in conjunction with plaintiff's previous attempt to extricate itself from the defendant's ownership, provide mitigating considerations.

In any event, even assuming that § 6212(e) did apply, no damages or attorneys' fees would be warranted under the unique circumstances of this case for the following reasons.

First, the plain language of N.Y.C.P.L.R. 6212(e) specifies that damages must be "sustained by reason of the attachment." *See E.T.I. Euro Telecom Int'l N.V. v. Republic of Bolivia*, No. 08 Civ. 4247(LTS), 2008 U.S. Dist. LEXIS 99406, at *3, 2008 WL 5170168, at *1 (S.D.N.Y. Dec. 9, 2008) (damages must be "the natural and proximate consequence of the wrongful attachment."); *cf. Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553 (2d Cir.2011) ("Although we hold that a wrongfully enjoined party is entitled to a presumption in favor of recovery, that party is not automatically entitled to damages sought.").[10] Defendant has not demonstrated that it sustained any damages by reason of the first attachment.

As we noted in granting the first attachment, its "practical impact ... is actually quite minimal." *See Astra Oil Trading N.V. v. PRSI Trading Co. L.P.*, No. Civ. 10467(NRB), 2008 WL 5429821 at *5 (S.D.N.Y. Dec. 23, 2008). The attachment order permitted defendant to continue using the funds in one of the two accounts, held at Citibank, for trading purposes.

---

9. We thus reject defendant's claim, made in connection with the argument above pertaining to standing, that plaintiff's counsel sought to mislead the Court about the identity of the party entitled to indemnification.

10. Although defendant is correct that damages are presumptively measured at the New York statutory interest rate and not the actual amount of loss, *see Subin v. U.S. Fidelity & Guaranty Co.*, 12 A.D.2d 49, 52, 208 N.Y.S.2d 278, 281 (1st Dep't 1960), that is no reason to conclude that damages are presumed even where loss of use is not caused by the attachment.

Not only has defendant continued using the funds in the Citibank account as permitted, but plaintiff asserts that the account balance has increased by nearly $12 million as a result of defendant's trading activities.

The other account under attachment was held at BNP Paribas, which, even before the first attachment had issued, refused to release any funds to defendant without plaintiff's consent. The BNP Paribas account situation is similar to that in *Plessner v. Continental Cas. Co.*, 25 Misc.2d 518, 522, 82 N.Y.S.2d 540, 545 (N.Y.Sup.Ct. 1948), where the court denied damages for loss of use of attached funds in part because a pre-existing executive order restrained the plaintiff from withdrawing funds even in the absence of any attachment. Here, defendant's loss of use of funds in the BNP Paribas account was not proximately caused by the attachment, but by BNP Paribas's prior decision.[11] Thus, no damages would be warranted for the loss of use of funds in either attached account.

Second, only the *reasonable* attorneys' fees and costs defendant has incurred would be recoverable under N.Y.C.P.L.R. 6212(e). We do not consider the expenditure of over $360,000 in total attorneys' fees and costs to vacate the attachment to be reasonable.[12] The bottom line is that an attachment in this litigation was essen-

tial from the plaintiff's perspective and of little practical impact from the defendant's vantage point. It is clear that defendant adopted a strategy to delay payment of an acknowledged indemnity obligation separate and apart from any other dispute between the parties. While it is one thing to adopt a delaying strategy, it is quite another to compel the opposing party who has litigated reasonably to pay for its opponent's dilatory tactics. The refusal to pay an acknowledged debt was documented on the record at the outset of this case. *See Astra Oil Trading N.V. v. PRSI Trading Co. L.P.*, No. Civ. 10467(NRB), 2008 WL 5429821 at *5 (S.D.N.Y. Dec. 23, 2008). Thus, under the unique circumstances of this case, we decline to award defendant any attorneys' fees in connection with the vacated attachment because to do so would be unreasonable.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss for lack of subject matter jurisdiction is granted with respect to the first action, 08 Civ. 10467, and denied with respect to the second action, 10 Civ. 6067. The attachment issued in connection with the first action will be vacated, but *only after* a second substantively identical attachment has issued in connection with the second action. Plaintiff's attach-

---

**11.** Defendant argues that BNP Paribas's refusal to release funds makes continued attachment unnecessary. This argument ignores defendant's subsequent change in ownership, which may affect BNP Paribas's willingness to maintain the status quo going forward. We therefore reject the suggestion that a second attachment is unnecessary.

**12.** This figure includes nearly $60,000 attributed to BNP Paribas's attorneys. We note the case authority holding that N.Y.C.P.L.R. 6212(e) does not encompass non-owners of the attached property, who are normally expected to bear their own legal costs if they

choose to participate in litigation. *See Euro Telecom Int'l v. Bolivia*, 2008 WL 5170168, at *3–4. Therefore, we find defendant's inclusion of the nearly $60,000 in legal fees allegedly incurred by BNP Paribas in connection with the attachment to be wholly improper. We also wish it clear that this conclusion is not intended as a comment on the specific amount claimed either in terms of hours expended or hourly rate. Given our more fundamental conclusion that attorneys' fees ought not to be awarded in this case, we have not addressed those issues at all.

ment bond of $12.4 million will remain in place to secure the second attachment and will be modified accordingly, but no increase in the amount of the bond is warranted at this time. Defendant's request for damages and attorneys' fees is denied.

**SO ORDERED.**