[928 NYS2d 253]

Ambac Assurance UK Limited, Appellant, v J.P. Morgan Investment Management, Inc., Respondent.

First Department, July 14, 2011

2

## APPEARANCES OF COUNSEL

*Shapiro Forman Allen & Sava LLP*, New York City (*Michael I. Allen* and *Yoram Miller* of counsel), for appellant.

*Paul, Weiss, Rifkind, Wharton & Garrison LLP*, New York City (*Richard A. Rosen, John F. Baughman, Farrah R. Berse* and *Jennifer K. Vakiener* of counsel), for respondent.

## OPINION OF THE COURT

Catterson, J.

In this breach of contract action, the plaintiff seeks to recover damages for the loss of more than $1 billion from investment accounts created to fund notes it guaranteed. The plaintiff alleges that the defendant, investment manager J.P. Morgan Investment Management, Inc., failed to manage the accounts. Instead, defendant continued to hold toxic subprime securities in the accounts while its corporate parent, J.P. Morgan Chase, reduced its exposure to the same type of securities based on its knowledge that they "could go up in smoke."

4

We are asked to determine if the plaintiff's allegations are sufficient to survive a CPLR 3211 motion to dismiss where the plaintiff concedes that the defendant adhered to the contractual limitations on purchasing subprime securities.

The undisputed facts of the case are as follows: The plaintiff, Ambac Assurance UK, guaranteed timely payment of principal and interest for certain notes issued by Ballantyne, a special purpose vehicle established to reinsure term life insurance policies. To capitalize itself and finance the required reserves, Ballantyne issued more than $2 billion in securities.

On May 2, 2006, Ballantyne and the defendant entered into an investment management agreement (hereinafter referred to as the IMA) pursuant to which defendant agreed to act as the investment advisor for $1.65 billion of the proceeds raised by Ballantyne via its sale of the notes.[1] Pursuant to the IMA, Ballantyne opened two accounts: the Reinsurance Trust Account and the Pre-Funded Account over which the defendant had full investment authority subject to the investment guidelines.

The guidelines state that the goal of the investment policy "is to *obtain reasonable income* while providing a *high level of safety of capital*" (emphasis added). They identify the nature, quality and diversification requirements of the investments and contain specific limitations for investments on the basis of sectors and ratings.

The guidelines set forth the percentage of account assets which could be invested in each class and sector. Accordingly, permitted securities included home equity loan asset-backed securities (hereinafter referred to as HELOS) and mortgage-backed securities like Alt-As (hereinafter referred to as MBS). These securities required ratings of "A" through "AAA," and could not exceed percentages of 60% and 50% of the accounts, respectively.

The IMA also contains a "Discharge of Liability" provision which states that the defendant does not guarantee the future performance of the accounts or any specific level of performance. It further states that the defendant shall have no liability for any losses "except to the extent such [l]osses are judicially determined to be proximately caused by the *gross negligence or willful misconduct* of [defendant]" (emphasis added). While the IMA is governed by New York law, it further requires that

---

**1.** Plaintiff is a third-party beneficiary of the IMA and is entitled to enforce Ballantyne's rights thereunder.

investments be made in compliance with chapter 13 of the Delaware Insurance Code.

As of May 2006, the defendant began purchasing securities for the accounts. The record reflects that as of January 2007, approximately 30% of the assets in each account was invested in MBS, and approximately 59% of assets in both accounts was invested in HELOS. Subsequently, the accounts began sustaining losses. On December 28, 2007, after the accounts suffered significant losses, the guidelines were modified to require the defendant to seek approval from Ballantyne and the plaintiff before buying or selling assets for the accounts. The amended guidelines contained the same investment goal as the original guidelines, namely, obtaining "reasonable income while providing a high level of safety of capital."

Approximately one year later, in October 2008, Ballantyne terminated the defendant as its investment advisor. By this time, the accounts allegedly had lost $1 billion of the $1.65 billion entrusted to the defendant just 30 months earlier. Ballantyne subsequently failed to make scheduled payments under the notes, and the plaintiff's guarantees were called upon.

In or about June 2009, the plaintiff commenced this action on behalf of Ballantyne seeking damages arising from the defendant's alleged breaches of the IMA, and of chapter 13 of the Delaware Insurance Code. The plaintiff also alleges a breach of fiduciary duty, and a tort cause of action in gross negligence.

The plaintiff's allegations stem from an article in Fortune magazine, published in September 2008 in which J.P. Morgan Chase CEO, Jamie Dimon, was quoted as having concluded as early as October 2006 that the subprime securities market "could go up in smoke." (Shawn Tully, *Jamie Dimon's Swat Team, How J.P. Morgan's CEO and His Crew are Helping the Big Bank Beat the Credit Crunch*, Fortune, Sept. 2, 2008.) He was further described as having instructed his subordinates to "watch out for subprime," directing the head of securitized products to "sell a lot of our positions." (*Id.*)[2]

The plaintiff alleges that the defendant continued to purchase and hold such subprime securities as HELOS and MBS in Ballantyne's accounts even after J.P. Morgan Chase had "evidence about the growing risk of collapse of the [s]ubprime [s]ecurities

---

**2.** The article states that "J.P. Morgan mostly exited the business of securitizing subprime mortgages when it was still booming, shunning now notorious instruments such as SIVs (structured investment vehicles) and CDOs (collateralized debt obligations)." (*Id.*)

market."[3] Hence, the plaintiff alleges that the defendant breached the agreement by failing to manage the accounts in accordance with the stated objective of seeking a "reasonable income and a high level of safety of capital."

The defendant made a pre-answer motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7). It argued, inter alia, that the breach of contract claim should be dismissed because the defendant had complied with the guidelines, and did not act with gross negligence or willful misconduct or violate the Delaware Insurance Code. The defendant further argued that Dimon's statements, as reported in Fortune, did not concern the type of securities at issue here. It also argued that the tort claims were preempted by the Martin Act. (General Business Law § 352 *et seq.*)[4]

The court granted the motion dismissing the complaint, and noted, inter alia, that the plaintiff had conceded that the defendant had not exceeded the percentage limitations contained in the guidelines. (27 Misc 3d 1221[A], 2010 NY Slip Op 50835[U].) The court, relying on our determination in *Guerrand-Hermès v Morgan & Co.* (2 AD3d 235 [1st Dept 2003], *lv denied* 2 NY3d 707 [2004]), held that "[m]erely alleging failure to pursue an investment objective, where defendant actually followed the specific diversification requirements contained in the Guidelines that were intended to implement that objective, is not sufficient to set forth a claim for breach of contract." (2010 NY Slip Op 50835[U], *5.)

The court further found that statements made by Dimon concerning the market, as reported in Fortune and MarketWatch articles, referred to collateralized debt obligations (CDOs) and mortgage lending, and did not concern the type of mortgage-backed securities at issue here.

■ We now reverse and reinstate the complaint in its entirety. We find that, at this stage of the pleadings the motion

---

**3.** The article also indicates that any information available to J.P. Morgan Chase would have been made available to its affiliates. It states: "The Dimon team . . . mine every part of the business for detailed information—especially data that point to trouble—then share it at warp speed throughout the corporation." (*Id.*)

**4.** This issue is not argued by the parties on appeal in light of this Court's decisions in *Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.* (80 AD3d 293 [1st Dept 2010], *lv granted* 2011 NY Slip Op 64361[U] [1st Dept 2011]) and *CMMF, LLC v J.P. Morgan Inv. Mgt. Inc.* (78 AD3d 562 [1st Dept 2010]), but defendant reserved its right to so argue, if appropriate, following consideration of the issue by the Court of Appeals.

court should have accepted the plaintiff's allegations as true, given the plaintiff the benefit of every possible inference, and simply ascertained whether plaintiff's allegations evidenced a cognizable cause of action. (*See Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 80 AD3d 293 [1st Dept 2010], *supra*, citing *Samiento v World Yacht Inc.*, 10 NY3d 70, 79 [2008].) For the reasons set forth below, we further find that the motion court erred in failing to conclude that the plaintiff's allegations are sufficient to sustain a breach of contract claim.

As a threshold matter, we reject the motion court's observation that the basis for the plaintiff's allegations, namely, CEO Dimon's statements in Fortune did not concern the type of securities held in the subject accounts. For the same reasons, we also reject the defendant's reiteration, on appeal, that the articles are not evidence of the defendant's knowledge about the subject securities because the securities referred to in the article are SIVs and CDOs which were never purchased for the accounts.

We are not required to determine at this stage if, at the time of the events described in the complaint, there was a distinction for investment purposes between the Dimon-referenced CDOs (the underlying value of which was based on subprime mortgages)[5] and the securities in the subject accounts which were home equity loan asset-backed securities and mortgage-backed securities allegedly also comprised of subprime loans. As the plaintiff asserts, and as the articles in the record establish, Dimon's concern embraced the entire mortgage market, including mortgage lending and mortgage products. Particularly relevant is the following excerpt from Fortune:

> "One red flag came from the mortgage servicing business . . . [I]n October 2006, the chief of servicing said that late payments on subprime loans were rising at an alarming rate. The data showed that loans originated by competitors like First Franklin and American Home were performing three times

---

**5.** A fact established in the record by defendant's exhibit, an article titled, "Turmoil in the Financial Markets," which states as follows:

"The credit crisis arose from losses in mortgage loans . . . Many of these loans were 'subprime' loans . . . Mortgage originators sold the home loan mortgages to others, including off balance sheet entities created by investment banks. These entities issued structured notes called collateralized debit [*sic*] obligation[s] (CDOs), secured by groups of home mortgage loans."

worse than J.P. Morgan's subprime mortgages. 'We concluded that underwriting standards were deteriorating across the industry,' says Dimon." (Shawn Tully, *Jamie Dimon's Swat Team, How J.P. Morgan's CEO and His Crew are Helping the Big Bank Beat the Credit Crunch*, Fortune, Sept. 2, 2008.)

This, the article states, led to his team "mostly exit[ing] the business of securitizing subprime mortgages" with the result that in late 2006, J.P. Morgan Chase "started slashing its holdings of subprime debt. It sold more than $12 billion in subprime mortgages that it had originated." (*Id.*)

The plaintiff's breach of contract claim rests on the allegation that while J.P. Morgan was actively divesting itself of the risky subprime mortgages it had originated, the defendant was doing nothing about riskier subprime mortgages originated by others and held in the subject accounts.[6] In other words, that the defendant continued to invest in securities which it knew were entirely incompatible with plaintiff's investment objective and stated goal to "obtain reasonable income while providing a high level of safety of capital."

Precedent, therefore would appear to mandate a finding that the plaintiff, at the very least, has sufficiently alleged gross negligence as a basis for its breach of contract claim. (*See Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 80 AD3d at 305 [plaintiff's stated goal was "reasonable income while providing a high level of safety of capital," but defendant invested "substantially all" of the assets in subprime securities which it knew were risky], quoting *Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d 821, 823-824 [1993] [gross negligence consists of "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing"].)

This is entirely consistent with our holding in *Assured.* The defendant in this case misapprehends our holding by relying merely on the decretal paragraph in *Assured.*[7] The defendant thus argues that *Assured* mandates dismissal of a breach of

---

6. These apparently included—as reflected in the record though not noted by the plaintiff—mortgages originated by the above-named competitor First Franklin, whose defaults were apparently known to J.P. Morgan Chase in October 2006 to be three times worse than its own, but which were still being held for the accounts at the time of the amended guidelines in December 2007.

7. (*Compare Assured*, 80 AD3d at 305 [plaintiff's contract claim sufficiently alleges gross negligence to survive a motion to dismiss], *with Assured*, 80 AD3d at 306 [order "should be modified . . . to reinstate the contract claims

contract claim where an investment manager has discretionary authority, and is in compliance with the contractual diversification requirements.

This is error. The omission in the decretal paragraph is not reflective of the holding. In *Assured*, we simply did not address the issue that the defendant raises here, viz., that compliance with the sector and ratings limitation provision forecloses a breach of contract action. To the extent that it was silent as to this argument, no principle was enunciated.

Nor does our ruling in *CMMF, LLC v J.P. Morgan Inv. Mgt. Inc.* (78 AD3d 562 [2010]) help the defendant as to this issue. In that case, this Court sustained a breach of contract cause of action on the basis of the plaintiff's allegations that the defendant breached the sector and ratings limitations provision of the agreement. (*CMMF*, 78 AD3d at 563.) That determination, however, does not stand for the proposition that the provision *must* be allegedly violated in order for a plaintiff's breach of contract claim to survive. It simply means the Court did not need to reach the issue we are now asked to determine.

Here, the defendant asserts—and the plaintiff concedes—that the subject subprime securities did not exceed the percentages set forth in the agreement—even after the guidelines were amended. Thus, contends the defendant, the motion court properly dismissed the breach of contract claim finding that defendant had followed the "specific diversification requirements."

Notwithstanding its concession, the plaintiff asserts that the motion court erred in its ruling because it ignored fundamental principles of contract construction. We agree. (*See e.g. Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [well established that unambiguous contracts must be interpreted in accordance with their plain meaning]; *see also Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.*, 63 NY2d 396, 403 [1984]; *150 Broadway N.Y. Assoc., L.P. v Bodner*, 14 AD3d 1, 6 [1st Dept 2004] [contracts must be construed to "avoid an interpretation that would leave contractual clauses meaningless" (internal quotation marks and citation omitted)].)

In this case, the motion court overlooked the plain meaning of the IMA by misreading the *limitations* provision as a

---

based on defendant's alleged violation of Delaware Insurance Code chapter 13 that accrued on or after June 26, 2007, as well as claims for breach of fiduciary duty and gross negligence . . . and otherwise affirmed"].)

*requirements* provision. Indeed, the defendant's argument that the accounts, at any one time, did not hold more than the 50% to 60% of subprime Alt-A mortgage securities *as permitted* by the IMA suggests that the distinction between "limitation" and "requirement" still eludes the defendant.

The plain meaning of "limitations" connotes a point beyond which a party may not proceed. It is not a target that a party is obligated to meet which would instead constitute a "requirement." Accordingly, any reliance by the motion court or defendant on our determination to dismiss the breach of contract claim in *Guerrand-Hermès v Morgan & Co.* (2 AD3d 235 [2003], *supra*) is misplaced. The facts and contract language are distinguishable. In that case, there were, indeed, specific "investment guidelines' diversification requirements" that were intended to implement the objective. (*Guerrand-Hermès*, 2 AD3d at 238.) The investment management agreement provided, inter alia, that $18 million was to be invested in a leveraged portfolio of emerging market debt securities. Moreover, the plaintiff acknowledged that he understood there were risks associated with investing in emerging markets, and that investment in such markets "can lead to losses of principal, including all of the $18 million equity invested, or more." (2 AD3d at 236.)

In this case, there were no specific requirements as to investing in any particular types of securities. Certainly, there was no warning or any acknowledgement that all assets could be lost. The diversification provision listed HELOS and Alt-As as securities in which the defendant was permitted to invest, *up to* certain percentage limits of the account assets. However, the diversification provision did not *require* the defendant to invest in them at all.

The plaintiff asserts therefore, that adhering to the maximum contractually permitted percentages despite "seismic changes to the economy, to world markets and J.P. Morgan's own internal conclusion[s] [about an impending financial meltdown in the housing market]," suggests the very opposite of managing the accounts and exercising discretion as to whether the securities should be held at all. We agree.

Action or non-action in accordance with a provision that *limits* rather than mandates certain actions does not immunize defendant from a breach of contract claim when that action/non-action is egregiously at odds with the stated contractual requirement that defendant pursue the investment objective of reasonable income and high level of safety of capital. As the

plaintiff correctly asserts, the motion court's holding that there was no breach of agreement so long as the defendant did not exceed the maximums stated in the sector and ratings provisions would allow the defendant to insulate itself from liability by closing its eyes to known risks, and so would render the contract's stated goal of "a high level of safety of capital" impermissibly meaningless. (*See e.g. Two Guys from Harrison-N.Y.*, 63 NY2d at 403.)

Contrary to the defendant's argument, plaintiff's claim is not based on the allegation of failure to achieve—no matter how strenuously the defendant attempts to recast the allegations so that it can then cite to precedent mandating dismissal of the complaint on such basis. (*See CMMF*, 78 AD3d at 563 [no breach of contract claim may be sustained based on a failure to achieve an investment objective where investment manager has discretionary authority], citing *Vladimir v Cowperthwait*, 42 AD3d 413 [1st Dept 2007].)

That the defendant failed to achieve the goal of reasonable income and high safety of capital is undisputed, as is the foreclosure of plaintiff's pursuit of a claim on that basis. (*See CMMF*, 78 AD3d at 563.) Here, however, the plaintiff's claim rests on the allegations that, notwithstanding its adherence to certain limitations, the defendant failed to manage the accounts in accordance with the agreed upon objective. Had it done so, plaintiff asserts, it might have followed the path taken by J.P. Morgan Chase to divest itself of securities based on subprime mortgages before the losses turned catastrophic.[8] Instead, as the defendant concedes, the accounts were for the most part invested by January 2007, "with minimal subsequent account activity" until Ballantyne closed the accounts almost two years later. As such the plaintiff's allegations are sufficient to sustain a breach of contract claim. (*See Sergeants Benevolent Assn. Annuity Fund v Renck*, 2004 WL 5278824 [Sup Ct, NY County 2004], *revd on other grounds* 19 AD3d 107 [1st Dept 2005] [plaintiffs' breach of contract claim upheld against defendant investment brokerage on allegations that defendant would not have lost $27 million had it pursued the conservative invest-

---

8. At oral argument, defendant argued that management of the accounts included its assessment of whether to sell, or whether securities would regain their value. For purposes of the defendant's motion to dismiss, we reject that theory of management in view of the plaintiff's allegations that J.P. Morgan's concerns in October 2006 led to it divesting itself of similar securities when subprime securities were still being held in the subject accounts 15 months later.

ment plan required by the contract]; *see also Scalp & Blade v Advest, Inc.*, 281 AD2d 882, 883 [4th Dept 2001].)

We reject the defendant's contention that *Sergeants Benevolent Assn. Annuity Fund* is distinguishable. The defendant argues that, in that case, defendant breached the agreement to pursue "conservative capital appreciation" by investing in highly volatile, risky tech, communications and Internet stocks which were not permitted by any provision of the contract. We find this argument unpersuasive for the reasons already stated above. Whether permitted or not, once the defendant acquired information about the riskiness of subprime securities it was also aware that such securities were incompatible with the stated investment objective of the accounts.

■ The plaintiff has also sufficiently alleged that defendant breached the Delaware Insurance Code. Delaware Code Annotated, title 18, § 1305 (4) provides: "An insurer shall not at any [one] time have more than 50% of its assets invested in obligations under § 1323 of this title, exclusive of that portion of such obligations guaranteed or insured by an agency of the United States government." Obligations under section 1323 (a) are "bonds, notes or other evidences of indebtedness secured by first or second mortgages," and are not limited to individual mortgages. Therefore, section 1323 covers more than 50% of the securities contained in the accounts. (*See Assured*, 80 AD3d at 305.)

We further reject the defendant's argument that it complied with section 1308 of the Delaware Insurance Code, and that compliance with any section is sufficient to render an investment compliant with the code. The defendant maintains that the securities at issue met the requirements contained in section 1308, as they were all rated "A" or higher by Standard and Poor's, or "A2" or higher by Moody's at the time of purchase. However, the statements of record only reflect holdings in the accounts as of two dates, May 31, 2006 and January 31, 2007, and do not, on their face, establish any regulatory compliance. Thus, defendant has failed to demonstrate conclusively, through documentary evidence, that it complied with this section.

■ The defendant has not established entitlement to dismissal of plaintiff's claims as time-barred. Section 7 (d) of the IMA provided that the plaintiff was obligated to "object in writing" as "to any act or transaction . . . within a period of ninety (90) days from the date of receipt of any statement" from the defendant. The holding in *Assured* is not applicable here since

the plaintiff did not initially assert that the amended guidelines (in writing) constituted an objection as they did in *Assured* (80 AD3d at 304); nor does the record reflect that Ballantyne made a prior oral objection that resulted in the amended guidelines. In any event, whereas the amended guidelines in *Assured* restricted the defendant making future investments in cash equivalents, no such restriction applied here, but on the contrary included the list of the permitted securities.

However, as the motion court correctly noted, the plaintiff's claims are based on defendant's failure to manage the accounts in accordance with the investment objective rather than upon any specific act or transaction. Hence, they are based on conduct that would not have shown on any statement, namely, that defendant failed to follow a course of action with respect to the accounts despite its awareness of the declining subprime securities market and its own divestiture of such securities. Such knowledge, which is the cornerstone of the plaintiff's allegations, is not a fact which would be evident in the statements. Thus, the defendant has not established entitlement to pre-answer dismissal on the ground that the action is time-barred.

Finally, assuming, arguendo, that the appeal pending in the Court of Appeals affirms this Court's finding that plaintiff's tort claims for gross negligence and breach of fiduciary duty are not preempted by New York's General Business Law § 352 *et seq.* (the Martin Act), we find that neither are they duplicative of the breach of contract claim. (*See Assured*, 80 AD3d at 306.)

Accordingly, the order of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered March 25, 2010, which granted defendant's motion to dismiss the complaint, should be reversed, on the law, with costs, and the motion denied.

SAXE, J.P., ACOSTA, ABDUS-SALAAM and ROMÁN, JJ., concur.

Order, Supreme Court, New York County, entered March 25, 2010, reversed, on the law, with costs, and the motion to dismiss the complaint denied.