11-4306-cv
Bayerische Landesbank, New York Branch et al. V. Aladdin Capital Management LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: March 12, 2012                              Decided:  August 6, 2012)

Docket No. 11-4306-cv

_____


BAYERISCHE LANDESBANK, NEW YORK BRANCH and BAYERISCHE LANDESBANK,

*Plaintiffs-Appellants*,

—v.—

ALADDIN CAPITAL MANAGEMENT LLC,

*Defendant-Appellee*.

_____

Before:

LIVINGSTON and LOHIER, *Circuit Judges*, and RAKOFF, *District Judge*.[*]

_____

Appeal from Orders and Judgment of the United States District Court for the Southern District of New York granting the motion of Defendant-Appellee Aladdin Capital Management LLC ("Aladdin") to dismiss the Amended Complaint for failure to state a claim. Plaintiffs-Appellants Bayerische Landesbank, New York Branch, and Bayerische Landesbank, investors in a Collateralized Debt Obligation ("CDO") managed by Aladdin, contend that Aladdin breached its duty to the investors by managing the investment portfolio in a grossly

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

negligent fashion, causing plaintiffs to lose their entire $60 million investment. Plaintiffs, who were not parties to the contract naming Aladdin as the portfolio manager and defining its duties, contend that they were intended third-party beneficiaries of the contract, or, in the alternative, that Aladdin breached a duty in tort by managing the portfolio in a reckless and grossly negligent fashion.

We hold that plaintiffs have plausibly alleged that the parties to the contract intended the contract to benefit the investors in the CDO directly and create obligations running from Aladdin to the investors. We further hold that plaintiffs have plausibly alleged that the relationship between Aladdin and the plaintiffs was sufficiently close to create a duty in tort for Aladdin to manage the investment on behalf of plaintiffs. Finally, we hold that plaintiffs have alleged sufficient facts that plausibly suggest Aladdin acted with gross negligence in managing the investment portfolio, ultimately leading to the failure of the investment vehicle and plaintiffs' losses.

Accordingly, for the reasons stated below, the judgment of the district court is **REVERSED** and the case is **REMANDED** to the district court for further proceedings consistent with this Opinion.

_____

DAVID SPEARS (Jason Mogel, Laurie Faxon Richardson, *on the brief*), Spears & Imes LLP, New York, N.Y., for *Plaintiffs-Appellants*.

JASON M. HALPER (Lambrina Mathews, *on the brief*), Cadwalader, Wickersham & Taft LLP, New York, N.Y., for *Defendant-Appellee*.

_____

RAKOFF, *District Judge*:

In this case, we are called on to determine whether an investor in a special investment vehicle — a synthetic collateralized debt obligation ("CDO") that sold interests in a credit default swap — can bring an action against the manager of the investment portfolio for the loss of its investment where the investor was not a party to the contract that defined the manager's role and duties.

Plaintiffs-Appellants Bayerische Landesbank ("Bayerische") and Bayerische Landesbank New York Branch filed this action against Defendant-Appellee Aladdin Capital Management

LLC ("Aladdin") for breach of contract and gross negligence based on Aladdin's alleged disregard of its obligation to manage the portfolio in favor of the investors. Aladdin's purportedly gross mis-management allegedly caused plaintiffs to lose their entire $60 million investment in the CDO. On January 31, 2011, plaintiff Bayerische Landesbank, New York Branch filed its original Complaint in the United States District Court for the Southern District of New York seeking to recover damages for the loss of its investment, and later filed an Amended Complaint joining its parent, Bayerische Landesbank, as co-plaintiff. Aladdin moved to dismiss the Amended Complaint, and, by Order dated July 8, 2011, the district court granted the motion. The district court held that, because of a provision of the contract limiting intended third-party beneficiaries to those "specifically provided herein," plaintiffs could not bring a third-party beneficiary breach of contract claim, and held also that plaintiffs could not "recast" their failed contract claim in tort. For the reasons described below, however, we conclude that plaintiffs have properly alleged both a breach of contract claim and a tort claim.

## FACTUAL ALLEGATIONS

The pertinent allegations in plaintiffs' Amended Complaint, together with those "documents . . . incorporated in it by reference" and "matters of which judicial notice may be taken," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted), are as follows:

Plaintiff Bayerische Landesbank is a publically regulated bank incorporated in Germany with its principal place of business in Munich, Germany. Co-plaintiff Bayerische Landesbank, New York Branch is the New York branch of Bayerische Landesbank and is a federally chartered bank licensed by the United States Office of the Comptroller of the Currency.

Defendant Aladdin is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. Aladdin is a registered investment adviser under the Investment Advisers Act of 1940, and is a subsidiary of Aladdin Capital Holdings LLC ("ACH"), an investment bank.

In December 2006, plaintiffs invested $60 million in a collateralized debt obligation structured and marketed by defendant Aladdin and by non-parties Goldman Sachs & Co. and Goldman Sachs International (collectively, "Goldman Sachs"). A CDO is a financial instrument that sells interests (here in the form of "Notes") to investors and pays the investors based on the performance of the underlying asset held by the CDO. The CDO at issue in this case, called the Aladdin Synthetic CDO II ("Aladdin CDO") was a "synthetic" CDO, meaning that the asset it held for its investors was not a traditional asset like a stock or bond, but was instead a derivative instrument, *i.e.*, an instrument whose value was determined in reference to still other assets. The derivative instrument the Aladdin CDO held was a "credit default swap" entered into between the Aladdin CDO and Goldman Sachs Capital Markets, L.P. ("GSCM") based on the debt of approximately one hundred corporate entities and sovereign states that were referred to as the "Reference Entities" and comprised the "Reference Portfolio."

A credit default swap ("CDS") is a financial derivative that allows counterparties to buy and sell financial protection for the creditworthiness of specific corporations or sovereign entities, here the Reference Entities. A counterparty taking the position that the Reference Entities would *not* experience a "Credit Event" — such as bankruptcy, default, restructuring, or failure to pay a defined obligation — is said to be the "protection seller," similar to an insurance underwriter. A counterparty taking the position that the Reference Entities *would* experience a

4

Credit Event is the "protection buyer," similar to an individual purchasing insurance. A credit default swap differs from traditional insurance in that the protection buyer need not actually own the underlying asset or security in order to purchase protection on it. More to the point, the protection seller is, in effect, taking a long position and betting that there will be no Credit Event, while the protection buyer is taking a short position and betting that there will be a Credit Event.

Here, Aladdin and Goldman Sachs created a shell entity, the "Issuer" of the Aladdin CDO, to serve as the protection seller, while GSCM served as the protection buyer. Thus, GSCM was to pay premiums to the Issuer in order to purchase protection against the occurrence of a Credit Event. The Issuer was also authorized to establish a separate "short" Reference Portfolio, which would reverse the counterparties' positions — *i.e.* the Issuer would be the protection buyer and GSCM would be the protection seller.

Since the Issuer was just a shell entity, Aladdin and Goldman Sachs, in order to fund the CDO and have money available to pay GSCM in the event of a Credit Event, marketed interests in the CDO to investors in the form of Notes. The Notes were formally issued by the Issuer, Aladdin Synthetic CDO II SPC, and the Co-Issuer, Aladdin Synthetic CDO II (Delaware) LLC, which are limited liability companies incorporated under the laws of the Cayman Islands and Delaware, respectively. Aladdin, as "Portfolio Manager," used the money received from investors who purchased the Notes to purchase interest-yielding securities that, together with the payment of premiums by GSCM, were intended to pay quarterly interest payments to Noteholders until the CDO matured in December 2013, when the principal would be returned to the Noteholders. The principal that investors paid to purchase the Notes was available to cover payments to GSCM as the protection buyer if there were a Credit Event.

5

The Issuer split the Notes into separate Series, each with different levels of risk and return. Each Series of Notes had a specific level of risk, or "subordination," that protected each Series of Notes against possible losses to the invested principal. For each Series issued, a separate "Indenture" spelled out the relationship between the Noteholders of that Series and the CDO. If a Reference Entity in the Reference Portfolio (*i.e.*, the securities underlying the CDS) suffered a Credit Event, GSCM would reduce the level of subordination for the affected Series by a certain percentage amount, depending on the weight of the relevant Reference Entity in the Reference Portfolio. The plaintiffs here purchased Notes in both Series B-1 and Series C-1. The level of subordination for plaintiffs' Series B-1 Notes was 5.15% and the level of subordination for the Series C-1 Notes was 4.65%.

The structure of the CDS entered into by the Issuer and GSCM allowed the Issuer to change the composition of the overall Reference Portfolio by trading Reference Entities into or out of the Reference Portfolio. This trading also affected the level of subordination. If the Issuer replaced a low-risk Reference Entity (reflected by a smaller "spread" or insurance premium) with a higher-risk Reference Entity (reflected by a larger spread), that would increase the level of subordination for the Noteholders, and vice versa.

If the level of subordination for a Series went more than 1% below zero, the entire amount invested by the Noteholders in that Series would go to GSCM, and the Notes would become worthless and no longer deliver interest payments. Plaintiffs allege that the Series they invested in could sustain Credit Events with respect to approximately ten or eleven Reference Entities before their subordination levels fell to more than 1% below zero. Additionally, if Aladdin purchased protection for Reference Entities through the short portfolio, the Noteholders' subordination levels would be increased if those short Reference Entities experienced a Credit Event. Thus, the financial interests of GSCM and the Noteholders were adverse.

6

Since the Issuer was just a shell entity, the Noteholders needed someone to manage the Reference Portfolio, and, according to plaintiffs, protect the Noteholders by minimizing the occurrence of losses and avoiding Credit Events. Here, Goldman Sachs and Aladdin structured the CDO so that Aladdin would manage the CDO as an independent investment manager on behalf of the Noteholders.

Plaintiffs allege that they purchased their Notes in the Aladdin CDO after Aladdin and Goldman Sachs came to the offices of Bayerische's New York branch to present marketing materials regarding the then-proposed Aladdin CDO and to solicit plaintiffs' investment. In the marketing book defendant provided to plaintiffs, defendant Aladdin allegedly represented that its interests were aligned with the Noteholders' interests and that it would manage the Reference Portfolio in a conservative and defensive manner to avoid Credit Events and thus losses to Noteholders. Aladdin's formal responsibilities, however, were spelled out in the Portfolio Management Agreement ("PMA"), an agreement between Aladdin and the shell Issuer that was not signed by the Noteholders. Plaintiffs purchased $60 million of the total $100 million worth of Notes from Goldman Sachs, which underwrote the CDO (*i.e.*, Goldman used its own money to purchase the Notes from the Issuer before reselling those Notes to investors like plaintiffs).

Plaintiffs did not enter into any direct contract with Aladdin. Aladdin, as the Portfolio Manager, selected the initial approximately one-hundred Reference Entities that comprised the Reference Portfolio. Plaintiffs allege that, following the issuance of the Aladdin CDO on December 19, 2006, Aladdin managed the portfolio in a grossly negligent fashion, culminating in the Reference Entities sustaining 11 credit events just three years into the CDO's seven-year term, thereby causing plaintiffs' Notes to default. As a result, plaintiffs lost their entire $60

7

million principal investment and any future interest from the remaining four years of the CDO term. Plaintiffs allege that, had Aladdin simply left the initial Reference Portfolio in place, plaintiffs would not have suffered any losses whatsoever.

On the basis of the foregoing allegations, the Amended Complaint asserts two claims: (1) a claim in contract alleging that Aladdin breached its obligations under the PMA; and (2) a claim in tort alleging that Aladdin's conduct was grossly negligent, resulting in harm to the Noteholders. On May 23, 2011, Aladdin moved to dismiss the Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). On July 8, 2011, the district court held oral argument on defendant's motion to dismiss and dismissed the complaint from the bench. The district court confirmed its ruling from the bench by Order dated July 8, 2011 and Judgment dated July 11, 2011. On July 15, 2011, plaintiffs moved for reconsideration of the district court's ruling, which the district court denied by Order dated September 14, 2011. Plaintiffs timely appealed the district court's Judgment and Orders.

## DISCUSSION

*Jurisdiction.* At the outset, we have an independent obligation to determine whether federal jurisdiction exists in this case. In the district court, the parties asserted that federal jurisdiction over this action existed pursuant to 28 U.S.C. § 1332, which provides for diversity jurisdiction for disputes between, *inter alia,* "citizens of a State and citizens or subjects of a foreign state." *Id.* § 1332(a)(2). This form of diversity jurisdiction is often referred to as "alienage" jurisdiction. *See, e.g.*, *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 94-97 (2002) (describing history of alienage jurisdiction). Despite the parties' agreement that such jurisdiction exists here, however, "we are obliged to satisfy ourselves that

8

jurisdiction exists." *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 133 (2d Cir. 2005) (alteration and internal quotation marks omitted).

For diversity purposes, a corporation is considered a citizen of the state in which it is incorporated and the state of its principal place of business. 28 U.S.C. § 1332(c)(1) (2006); *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002). Plaintiff Bayerische Landesbank is a corporation incorporated under the laws of Germany with its principal place of business in Munich, Germany.[2] Accordingly, Bayerische Landesbank is a citizen of Germany. Plaintiff Bayerische Landesbank, New York, is the New York branch of Bayerische Landesbank, and is licensed to do business in New York. The branch is not, however, incorporated separately from Bayerische Landesbank, either in New York or anywhere else. Therefore, for diversity purposes, Bayerische's New York branch takes the citizenship of Bayerische Landesbank, and is also a citizen of Germany. *See Creaciones Con Idea, S.A. de C.V. v. MashreqBank PSC*, 75 F. Supp. 2d 279, 281-82 (S.D.N.Y. 1999) (citing *Bailey v. Grand Trunk Lines New Eng.*, 805 F.2d 1097, 1101 (2d Cir. 1986)), *aff'd on other grounds*, 232 F.3d 79 (2d Cir. 2000).

Defendant Aladdin is a limited liability company that takes the citizenship of each of its members. *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000). Defendant Aladdin has one member: ACH. ACH, in turn, has ten members: four United States citizens who are domiciled in states of the United States and are thus citizens of those states, *see*

---

[2] We note, for the sake of completeness, that Bayerische Landesbank is a wholly-owned subsidiary of BayernLB Holding AG, and there is some evidence that BayernLB Holding AG is owned in part by the Free State of Bavaria. Bayerische Landesbank would still be considered a citizen of a foreign state, not an instrumentality of a foreign state, even if BayernLB Holding AG was majority-owned by a sovereign entity, because a *subsidiary* of a sovereign's instrumentality is not itself an instrumentality. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003).

9

*Universal Reins. Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 224 F.3d 139, 141 (2d Cir. 2000); four companies with domestic places of incorporation and principal places of business; one limited partnership with its principal place of business and all three of its U.S.-citizen partners domiciled in Connecticut; and a company incorporated in Delaware with its principal place of business in Tokyo, Japan.

The only member that could potentially defeat diversity jurisdiction here is the Delaware corporation with its principal place of business in Japan. We have diversity jurisdiction over cases between citizens of the United States and citizens of foreign states, but we do not have diversity jurisdiction over cases between aliens. More specifically, "diversity is lacking . . . where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens." *Universal Licensing*, 293 F.3d at 581.

For corporate citizenship, the version of section 1332(c) that was in effect at the time this action was commenced read: "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (2006). State, with a capital "S," clearly refers only to the States of the United States. The diversity statute repeatedly distinguishes between such "States" and a "foreign state" with a lowercase "s." *See, e.g.*, *id.* § 1332(a)(2)-(4), (d)(2)(B)-(C). "State" (capital S) is also referred to in connection with the "State in which the action was originally filed." *Id.* § 1332(d). And section 1332(e) expands the definition of "State" to U.S. Territories, the District of Columbia, and the Commonwealth of Puerto Rico. *Id.* § 1332(e); *see also Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) (noting the presumption that "identical words used in different parts of the same act are intended to have the same meaning").

10

We have not previously decided whether, under this prior version of section 1332(c), a corporation incorporated in the United States also takes the citizenship of its foreign principal place of business.[3] But three out of four of our sister Circuits and two district courts in this Circuit that have confronted this issue have concluded that a domestic corporation with a principal place of business abroad should be treated, for diversity purposes, as a citizen of only the State in which it is incorporated. *See MAS Capital, Inc. v. Biodelivery Sciences Int'l, Inc.*, 524 F.3d 831, 832-33 (7th Cir. 2008) (holding that, for a domestic corporation, "the foreign principal place of business does not count"); *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 543-44 (5th Cir. 1997) ("Absent congressional amendment to section 1332(c)(1) to the contrary, we must conclude that for diversity purposes a corporation incorporated in the United States with its principal place of business abroad is solely a citizen of its 'State' of incorporation."); *Cabalceta v. Std. Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989) (holding that if a domestic corporation's principal place of business is abroad, "the foreign principal place of business cannot be considered for diversity jurisdiction purposes"); *Lebanese Am. Univ. v. Nat'l Evangelical Synod of Syria & Leb.,* No. 04 Civ. 5434 (RJH), 2005 WL 39917, at *6-7 (S.D.N.Y. Jan. 6, 2005) (holding § 1332(c) does not apply to a domestically incorporated corporation with its principal place of business abroad); *Willems v. Barclays Bank D.C.O.*, 263 F. Supp. 774, 775 (S.D.N.Y. 1966) (same). That is to say, under the prior version of section 1332(c) that is applicable to this case, companies incorporated in the United States could not be "dual citizens" of the United

---

[3] In deciding this narrow issue, we do not opine on the more general debate about whether this prior version of section 1332(c) applied to foreign corporations at all. *See JPMorgan Chase Bank*, 536 U.S. at 98 n.3 (noting it is an open question but that the circuits to have addressed the issue have concluded that § 1332(c) does apply to both foreign and domestic corporations).

11

States and a foreign state for diversity purposes. *Willems*, 263 F. Supp. at 775. *But see Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir. 1994) (noting, in dicta, "[w]e draw no distinction between corporations incorporated in a state of the United States and those incorporated in a foreign country when determining the corporation's citizenship for purposes of diversity jurisdiction").

We agree with the majority interpretation of the version of section 1332(c) in effect at the time this action was commenced: the statute does not treat domestic corporations with foreign principal places of business as aliens. Although in past decisions we have simply cited section 1332(c) and stated that "a corporation is deemed to be a citizen both of the state in which it has its principal place of business and of any state in which it is incorporated," *see, e.g.*, *Universal Licensing*, 293 F.3d at 581, a corporation's *foreign* principal place of business has never before been a dispositive issue that forced us to squarely address whether the text of the prior version of section 1332(c) applied to foreign principal places of business. Before Congress enacted the "dual citizenship" provision of section 1332 in 1958, corporations were treated as citizens only of the State or foreign state in which they were incorporated. *See Danjaq, S.A. v. Pathe Commc'ns Corp.*, 979 F.2d 772, 773 (9th Cir. 1992) (citing *Nat'l S.S. Co. v. Tugman*, 106 U.S. 118 (1882)). Thus, a foreign corporation, even under the text of section 1332(c) — which makes no reference to foreign states — should logically continue to be treated as a citizen of its place of incorporation. Indeed, this is the ultimate conclusion we reached in *Franceskin v. Credit Suisse*, in determining that one of the defendants, a corporation incorporated in Switzerland with a place of business in New York, was a citizen of Switzerland, such that it remained an alien corporation. 214 F.3d 253, 258 (2d Cir. 2000). Because the only plaintiff in *Franceskin* was a

12

citizen of Argentina, diversity was destroyed and we dismissed the case for lack of jurisdiction. *Id.* The opposite view — that the foreign principal place of business of a domestic corporation makes that corporation an alien for diversity purposes — has no prior grounding in historical practice, nor in the text of section 1332. *See Torres*, 113 F.3d at 543 ("Outside of section 1332(c)(1), we are aware of no authority for classifying a corporation as a citizen of the place where it has its principal business. We therefore resort to our traditional legal framework in which a corporation is deemed to be a citizen of its place of incorporation.").

It is true that Congress has since amended section 1332(c) to include "foreign state" in the dual citizenship provision. Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63 § 102, 125 Stat. 758 (to be codified at 28 U.S.C. § 1332(c)(1)). Every corporation is now treated for diversity purposes as a citizen of both its state of incorporation and its principal place of business, regardless of whether such place is foreign or domestic. *Id.* Thus, if this case had been commenced in the district court after the effective date of the amendment, we would not have jurisdiction, as Aladdin would be considered an alien for diversity purposes. *See Franceskin*, 214 F.3d at 258. But Congress did not make the amendment to section 1332 applicable to cases pending when the Act was enacted on December 7, 2011. Instead, Congress made the amendment applicable to cases commenced only after January 6, 2012. Pub. L. No. 112-63 § 205, 125 Stat. 764. This case was commenced on January 11, 2011, almost a year prior. The amendment is thus not applicable.

Accordingly, we treat the Delaware corporation with its principal place of business in Japan as a citizen of the State of Delaware only. Thus, defendant Aladdin is a citizen of the various states of the United States of which its member, ACH, is a citizen (through ACH's

13

various members).  Plaintiffs are aliens; defendant is a U.S. citizen.  Plaintiffs allege damages in excess of $75,000.  We have jurisdiction over this case.

*Standing.*  While not challenging jurisdiction, Aladdin argues that Bayerische's New York branch lacks standing to sue, and thus is not a proper party to this case.  We agree.  Bayerische's New York branch is merely a branch of Bayerische's German headquarters that is licensed to do business in the U.S., through its charter with the Office of the Comptroller of the Currency, pursuant to the International Banking Act, 12 U.S.C. § 3101 (2006).  It is not separately incorporated, has no legal identity separate from Bayerische Landesbank, and therefore has no standing to assert a claim against Aladdin independent of Bayerische's claim.  *See First Nat'l Bank of Bos. (Int'l) v. Banco Nacional de Cuba*, 658 F.2d 895, 900 (2d Cir. 1981); *Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 652-54 (S.D.N.Y. 1998) (Sotomayor, J.) ("[T]he law seems fairly well-settled that the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law.").  It does not appear that this has any effect on the case in any material way, since Bayerische Landesbank is a proper plaintiff, and any actions affecting the New York branch in this case likewise affect Bayerische proper.  Accordingly, we will treat the claims of Bayerische Landesbank, New York Branch and Bayerische Landesbank as one and the same.

*Substantive Merits.*  Turning to the merits of Bayerische's claims, we review *de novo* a district court's dismissal of a complaint for failure to state a claim upon which relief can be granted, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).  "To survive a motion to dismiss, a complaint must contain

14

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).[4]

Bayerische alleges that Aladdin breached its duty to manage the Reference Portfolio in the Noteholders' favor and failed to perform its obligations "using a degree of skill, care diligence and attention consistent with the practice and procedures followed by reasonable and prudent [portfolio managers]," in such a manner that its actions amounted to gross negligence and reckless disregard of its obligations. But, as already noted, Bayerische was not a party to the PMA, which sets forth Aladdin's duties as Portfolio Manager. Only the shell Issuer and Aladdin signed the PMA. Accordingly, Bayerische seeks to hold Aladdin liable through two avenues: (1) that Bayerische, as a Noteholder, was an intended third-party beneficiary of the PMA that can enforce the contract; or (2) that, in the alternative, the contract created a legal duty in tort that Aladdin owed to the Noteholders, and Bayerische can therefore sue for damages based on Aladdin's gross negligence. The district court rejected both theories of recovery; but we disagree.

*(1) Breach of Contract: Third-Party Beneficiary.* The PMA is governed by New York law. Under New York law, a third party may enforce a contract when "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the

---

[4] Defendant argues that the district court's order denying plaintiffs' motion for reconsideration of plaintiffs' gross negligence claim must be reviewed on an abuse-of-discretion standard. But because this motion for reconsideration asked for reconsideration of the district court's order granting defendant's motion to dismiss *on the merits*, such that the denial of the reconsideration motion was "essentially an affirmance on the merits," we review the merits of the argument *de novo*. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 739 n.21 (2d Cir. 2010) (quotation marks omitted) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 534 (2d Cir. 1994)).

15

promised performance." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002) (quoting Restatement (Second) of Contracts § 302). The contract must "clearly evidence" an intent by the parties to permit enforcement by the third party, *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (internal alteration omitted), such that the benefit to the third party was "sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit [was] lost." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (internal quotation mark omitted). In determining whether the parties intended to benefit the third party, a court "should consider the circumstances surrounding the transaction as well as the actual language of the contract." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 302, Reporter's Note, cmt. a). "[D]ismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant, or where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." *Id.* (internal citations omitted).

Here, Aladdin argues that section 29 of the PMA expressly rules out any intent to benefit the Noteholders. *Cf. Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988) ("Under New York law, where a provision in a contract expressly negates enforcement by third parties, that provision is controlling."). Section 29 reads:

Beneficiaries

This Agreement is made solely for the benefit of the Issuers and the Portfolio Manager, their successors and assigns, and no other person shall have any right, benefit or interest under or because of this Agreement, *except as otherwise specifically provided herein.* The Swap Counterparty shall be an intended third party beneficiary of this Agreement.

16

PMA § 29 (emphasis supplied).  Aladdin argues, and the district court found, that because section 29 expressly names GSCM, the Swap Counterparty, as an intended third-party beneficiary, but does not expressly name the Noteholders anywhere in the section, the Noteholders were not "otherwise specifically provided herein," and therefore the parties to the Agreement did not intend for the Noteholders to be third-party beneficiaries of the PMA. Bayerische argues that reading "otherwise specifically provided herein" as limited to the names expressly listed *within section 29*, reads the wording too narrowly and ignores the other provisions of the contract that, in Bayerische's view, show a specific intent by the shell Issuer and Aladdin to benefit the Noteholders.

Against this background, we must first determine whether the language of section 29 unambiguously excludes any intent to benefit the Noteholders.  *See Subaru*, 425 F.3d at 124; *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002) (noting that if "complete, clear and unambiguous on its face[, such an exclusion] must be enforced according to the plain meaning of its terms").  In so deciding, we must also keep in mind that this inquiry here accrues in the context of a motion to dismiss, for "[u]nless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004).

"Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)).  By

17

contrast, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006). Whether a contract is ambiguous is a question of law for the court to decide. *JA Apparel*, 568 F.3d at 396.

On its face, we cannot conclude that section 29 precludes an intent by the parties to benefit the Noteholders. The "herein" in "except as otherwise specifically provided herein" is not defined. While it might be read to refer, as Aladdin argues, to only section 29, it could just as reasonably be read to refer, as Bayerische argues, to the PMA as a whole. Indeed, the latter interpretation seems more likely. The clause at issue comes at the end of a sentence that states "no other person shall have any right . . . under . . . this *Agreement*, except as otherwise specifically provided herein." (emphasis supplied). The following sentence, which identifies the Swap Counterparty as "*an* intended third party beneficiary" (emphasis supplied) has no language of limitation and could reasonably be read as clarification that, whomever else might be a third-party beneficiary, the Swap Counterparty is for certain. *See also Sony Computer Entm't Inc. v. Nippon Express U.S.A. (Ill.), Inc.*, 313 F. Supp. 2d 333, 336-38 (S.D.N.Y. 2004) (holding "specifically provided otherwise herein" broad enough to refer to full contract between Sony and common carrier, but not to provision in separate contract between a subcontracted carrier and railway company).

18

By contrast, in one of the cases the district court relied on, *India.com, Inc. v. Dalal*, the parties' negating clause read:

> Neither this Agreement or any provision hereof nor any Schedule, exhibit, certificate or other instrument delivered pursuant hereto, nor any agreement to be entered into pursuant hereto or any provision hereof, is intended to create any right, claim or remedy in favor of any person or entity, other than the parties hereto and their respective successors and permitted assigns and any other parties indemnified under Article XI.

412 F.3d 315, 318 (2d Cir. 2005). This language definitively precluded any intent by the parties to confer a benefit on a third party. Here, by contrast, the text of section 29 does not, on its face, specifically foreclose Bayerische's theory of recovery.

Accordingly, we must look beyond section 29 to the contract as a whole to determine whether "provided herein" should be read as limited to the Swap Counterparty or whether it can be fairly read to include the Noteholders like Bayerische. *See JA Apparel*, 568 F.3d at 397 (cautioning against reading contractual terms "in isolation"). As it happens, other portions of the PMA evince an intent to benefit the Noteholders by defining Aladdin's obligations and delineating the scope of its liability to the Noteholders. For example, section 6 of the PMA states that "the Portfolio Manager shall use all reasonable efforts to ensure that [it takes no action that would] . . . adversely affect the interests of the holders of the Notes in any material respect (other than as permitted under the Transaction Documents)." Even more tellingly, section 8 of the PMA, entitled "Benefit of this Agreement; Limit on Liability," states, in relevant part:

> The Portfolio Manager shall perform its obligations hereunder in accordance with the terms of this Agreement and the terms of the Transaction Documents applicable to it. The Portfolio Manager agrees that such obligations shall be enforceable at the insistence of each Issuer, the Trustee on behalf of the holders of the relevant Notes, or the requisite percentage of holders of the relevant Notes on behalf of themselves, as provided in the

19

relevant Indenture.[5]

Together, these sections plausibly demonstrate an intent to benefit the Noteholders.

Other sections of the contract further support this plausible interpretation. Section 11(c) of the PMA, for example, allows a majority of the Noteholders (or majority of the holders of each Series) to *remove* the Portfolio Manager for cause, where "cause" is defined, *inter alia*, as a "material breach" of the PMA. It would be odd to conclude that the parties intended to allow the Noteholders to remove Aladdin as Portfolio Manager for breaching its duties, but not allow them to sue Aladdin for damages resulting from that breach.

Defendant cites our non-precedential affirmance in *Banco Espirito Santo de Investimento, S.A.* as allegedly rejecting this "very same argument." *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *9 (S.D.N.Y. Dec. 22, 2003), *aff'd*, 110 F. App'x 191 (2d Cir. 2004) (summary order). We disagree. In *Banco*, the plaintiff had invested in a structured finance fund, called Captiva, which in turn invested in the senior debt obligations of U.S. corporations. *Id.* at *2. The limitation of liability clause between the Captiva fund (which was similar to the Issuer here) and Citibank (which was similar to Aladdin here),[6] stated:

---

[5] Bayerische has not included the relevant Indentures as part of the Amended Complaint, nor are the Indentures otherwise part of the record below. Nevertheless, Bayerische alleges that it purchased 100% of the Notes available in Series B-1 and C-1, and 60% of the Notes available in the entire CDO. It is therefore reasonable, on this motion to dismiss, to infer that 100% of the Notes available in those Series satisfies any "requisite percentages" required by the Indenture, particularly given that other portions of the relevant agreements require a majority of the Noteholders to accomplish various tasks (*e.g.*, removing the Portfolio Manager for cause). Any remaining question on this issue can be clarified on remand.

[6] Citibank in *Banco Espirito* was a level removed from the position Aladdin occupies in this case, because Citibank agreed to "supervise" the fund's portfolio manager, rather than manage the portfolio directly. *Banco Espirito*, 2003 WL 23018888, at *8.

[Citibank] shall [not] have any liability to [Captiva], or to its shareholders or creditors, for any error in judgment, mistake of law, or for any loss arising out of any investment, or for any other act or omission in the performance of its, his or her obligations to [Captiva] except for liability to which it would be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of its, his or her duties and obligations hereunder.

*Id.* at \*8. The district court concluded that this provision did not make plaintiff, a "shareholder," an intended third-party beneficiary of the contract, because "[t]his clause acknowledges only that Citibank may owe some duty to BESI *in BESI's capacity as a shareholder of Captiva*, not as a third-party beneficiary of the Administrative Agreements." *Id.* at \*9 (emphasis supplied). Here, by contrast, section 6 of the PMA shows an intent to benefit the Noteholders directly; and section 8 expressly acknowledges that Aladdin's obligations "shall be enforceable at the insistence of . . . the requisite percentage of holders of the relevant Notes *on behalf of themselves*, as provided in the relevant Indenture." PMA § 8 (emphasis supplied); *see also* § 9(a) (limiting liability to gross negligence but distinguishing between "Issuer, the Trustee, the Swap Counterparty, [and] the holders of Notes"); § 6.

Drawing all inferences in favor of the plaintiff, a plausible reading of the parties' Agreement is that the PMA expressly requires the Portfolio Manager to perform various obligations — including managing the Reference Portfolio — on behalf of the Noteholders.[7] The limitations on liability that discuss the Noteholders suggest that the parties intended that the Noteholders be able to sue Aladdin directly, albeit only for acts of gross negligence. Such a reading of the contract does not, as Aladdin argues, fail to give effect to the language of section

---

[7] The PMA also includes some more specific obligations that Aladdin undertook to the Noteholders, such as, for example, delivering "to the holders of the Notes (with copies to the Trustee, the Company, the Swap Counterparty . . . ), a commentary by the Portfolio Manager on market developments affecting the Specific Portfolios during the three-month period preceding such Report Date." PMA § 2(h).

21

29, for section 29 would still prevent non-Noteholders from suing on the PMA. Moreover, given section 8's limitation on enforcement directly by the Noteholders to the "requisite percentage" in the Indenture, section 29 could plausibly be read as intended to exclude small Noteholders, or secondary market Noteholders, from suing Aladdin directly.

In short, it is more than plausible that the parties intended the PMA to inure to the benefit of the Noteholders. *See Eternity Global Master Fund Ltd.*, 375 F.3d at 178 (holding contract with ambiguous terms should not be dismissed on pleadings). Otherwise, to read the ambiguous language of "specifically provided herein" as not encompassing these express obligations undertaken by Aladdin would leave these obligations enforceable only by the shell Issuer and the Swap Counterparty, GSCM, that, as the counterparty, had interests that were directly opposed to those of the Noteholders.

Thus, although section 29 is ambiguous, we need not look beyond the four corners of the contract as a whole to conclude that, drawing all inferences in Bayerische's favor, it is plausible that the parties intended the Noteholders to benefit from the PMA. Nonetheless, "where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered," *JA Apparel*, 568 F.3d at 397, and in the context of a motion to dismiss, "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state claim," *Eternity Global Master Fund*, 375 F.3d at 178.

Here, the allegations set forth in the Amended Complaint regarding Bayerische's decision to invest in the CDO plausibly indicate that the parties intended the PMA to benefit the Noteholders such as Bayerische. The complaint alleges that Aladdin and Goldman Sachs came to Bayerische's office in New York to present marketing materials regarding the then-proposed

22

Aladdin CDO and to solicit Bayerische's investment. In the marketing book, Aladdin represented that its interests were aligned with investors' interests in the CDO and that it would manage the Reference Portfolio in "a conservative and defensive manner" to avoid losses to the Noteholders, and gave some specifics as to the parameters it would use to manage the Portfolio conservatively. The Offering Circular that was included among the marketing materials specifically detailed how Aladdin could trade out Reference Entities, and explained that Aladdin and the CDO would use the PMA to define Aladdin's obligations. These allegations further support Bayerische's interpretation that Aladdin's obligations under the PMA were intended to protect the Noteholders.

These allegations also show the sharp contrast between this case and *Morse/Diesel*, the other case the district court primarily relied on in dismissing plaintiffs' breach of contract claim. *Morse/Diesel*, 859 F.2d 242. In *Morse/Diesel*, plaintiff Morse/Diesel, Inc. ("Morse") was retained as the general contractor to build the Times Square Hotel. *Id.* at 243-44. In turn, Morse subcontracted several other entities to perform specific jobs for the construction, pursuant to provisions of the general contract that contemplated subcontracting. *Id.* at 244. Morse sued one of its main subcontractors, Trinity, for failing to complete its work in a timely and competent manner. *Id.* Trinity, in turn, filed third-party counterclaims against other subcontractors and an architect, alleging, *inter alia*, that they negligently performed their obligations under their separate subcontracts such that Trinity was unable to complete the job on time and competently. *Id.* at 244-46.

Although Trinity alleged a claim for negligence against the other subcontractors, Trinity did not — like Bayerische here — allege a third-party-beneficiary breach of contract claim.

23

Thus, in *Morse/Diesel*, we analyzed only whether Trinity could bring a *negligence* claim against a party with whom it lacked contractual privity. We concluded that New York law did not allow for a construction subcontractor to sue another subcontractor or architect based on the facts presented, as nothing in the parties' obligations to perform "discrete, circumscribed roles in the overall construction project" indicated that the subcontracts were intended to benefit the *other subcontractors*, as opposed to the general contractor. *Morse/Diesel*, 859 F.2d at 247-48.

In reaching our conclusion in *Morse/Diesel*, we also noted that each of the subcontracts contained a third-party negation clause, which read:

> ARTICLE 19-No Third Party Beneficiary
> Except as otherwise provided herein, no provision of this Agreement shall in any way inure to the benefit of any third person (including the public at large) so as to constitute any such person a third party beneficiary of this Agreement or any one or more of the terms hereof or otherwise give rise to any cause of action in any person not a party hereto.

*Id.* at 246. In addition to our reading of the facts and New York case law that the subcontractors did not generally intend to benefit each other, *id.* at 247-48 (citing *James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.*, 92 A.D.2d 991 (3d Dep't 1983), *modified on other grounds*, 61 N.Y.2d 836 (1984); *Northrup Contracting, Inc. v. Village of Bergen*, 139 Misc. 2d 435 (N.Y. Sup. Ct. 1986), *modified on other grounds*, 129 A.D.2d 1002 (4th Dep't 1987)), we further reasoned that although "various provisions of those subcontracts . . . reflect and envision coordinated effort by the various subcontractors, the explicit negation of third-party beneficiary obligations in Article 19 weighs far more heavily in the balance." *Id.* at 248-49 (internal citation omitted). Concluding that Article 19 further tipped "the balance" against an intent for the subcontractors to have a duty to each other, we noted that "[u]nder New York law, where a provision in a contract expressly negates enforcement by third parties, that provision is controlling." *Id.* at 249.

24

The instant case is far different from *Morse/Diesel*, particularly as pertains to Bayerische's breach of contract claim. First, although the subcontracts in *Morse/Diesel* "envision[ed] coordinated effort" by the subcontractors (as one would expect by the nature of dividing up construction tasks to various subcontractors), we concluded that the subcontractors were working on behalf of the general contractor (who in turn, was working on behalf of the owner/developer), *not* on behalf of each other. *Id.* at 248-49. By contrast, here, the PMA expressly contemplates that Aladdin will undertake an obligation to manage the Reference Portfolio on behalf of the Noteholders. *See* PMA §§ 6, 8; *see also* § 2(i) (Aladdin's obligation to minimize occurrence of losses to Noteholders). Second, because *Morse/Diesel* was a tort case, we did not decide whether, as a matter of contract interpretation, "except as otherwise provided herein" referred to provisions of the contract outside of the no-third party beneficiary clause, or whether it was limited to Article 19. Third, even the titles of the relevant provisions reflect different intents by the parties in *Morse/Diesel* as compared to here. In *Morse/Diesel*, Article 19 was captioned "No Third Party Beneficiary." *Id.* at 246. By contrast, here, section 29 is captioned "Beneficiaries." In short, *Morse/Diesel* does not conflict with our conclusion that the provisions of the PMA plausibly evinces an intent by the Issuer and Aladdin to provide a benefit to the Noteholders, namely, Aladdin's management of the Reference Portfolio on behalf of the investors.

We therefore conclude that the district court erred in dismissing Bayerische's contract claim.

*(2) Duty of Care; Gross Neligence.* We turn then to Bayerische's second, alternative, claim: that Aladdin breached a duty of care, in tort, to the Noteholders, by engaging in acts that

25

amounted to gross negligence in its management of the Reference Portfolio. Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. *See, e.g.*, *Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987). Such a "legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract." *Id.* Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct. *See Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898-99 (2d Cir. 1980) (citing *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 408 (1958)). If, however, the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative. *See, e.g.*, *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995).

In the present case the district court held that, as alleged in the complaint, Bayerische's tort claim "relies upon the [contract] to define the duties and, therefore, its theory of negligence arises from duties created by the [contract]," and that since, "where there was an underlying contract that was creating the duties," a plaintiff cannot "circumvent a bar created by the contract by restating a claim as one for negligence," the tort claim was impermissibly duplicative of the contract claim. We disagree.

Drawing all reasonable inferences in favor of the complaint, Bayerische may be taken plausibly to have alleged the following: Bayerische was induced to purchase the Notes at issue by Aladdin's representations, *inter alia* — made in marketing materials and at a face-to-face meeting among representatives of Bayerische, Aladdin, and Goldman Sachs — that Aladdin's

26

"interests were aligned with investors," that the Reference Portfolio underlying the CDO "would consist of investment grade, high quality Reference Entities," and that Aladdin "would manage the Reference Portfolio of CDS in a conservative and defensive manner to avoid Credit Events and tranche losses." And Bayerische was further induced by the statement of Aladdin's "duties and responsibilities as portfolio manager for the CDO" set out in the PMA, which, *inter alia*, required Aladdin to act "in good faith using a degree of skill, care, diligence and attention consistent with the practice and procedures followed by reasonable and prudent institutional managers of national standing" for similar investment portfolios. Bayerische "placed [its] trust in [Aladdin] to perform its duties as portfolio manager . . . as [Aladdin] had represented that it would and committed to do," and Aladdin "understood that [Bayerische] had placed [its] trust in [Aladdin] to perform its duties as portfolio manager" as it had committed to do, "and that if [Aladdin] failed to do so, [Bayeriche] would be injured." And Bayerische, having thus reasonably relied on Aladdin's representations of contractual performance, lost its entire investment due to Aladdin's alleged gross negligence in managing the Reference Portfolio.

These allegations are sufficient to withstand a Fed. R. Civ. P. 12(b)(6) motion to dismiss. Under New York law, we think that, in light of Bayerische's allegations that it detrimentally relied on Aladdin's representations of how it would select the Reference Portfolio and manage the Portfolio for the life of the CDO, Bayerische has sufficiently established that "[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship" in this case. *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992). This legal duty, though *assessed* largely on the standard of care and the other obligations set forth in the contract, would *arise* out of the independent characteristics of the relationship between

27

Bayerische and Aladdin, and the circumstances under which Bayerische purchased the Notes linked to the Reference Portfolio that Aladdin, under the PMA, was to manage. As such, this duty, though certainly "connected with and dependent upon the contract," would nonetheless sufficiently "spring from circumstances extraneous to, and not constituting elements of, the contract," *Clark-Fitzpatrick*, 70 N.Y.2d at 389, to render it non-duplicative.

This conclusion is not the end of our inquiry, however. Under New York law, in the absence of privity, the scope of the "orbit of duty" to third parties must be carefully examined "to limit the legal consequences of wrongs to a controllable degree and . . . protect against crushing exposure to liability." *Strauss v. Belle Realty Co.*, 65 N.Y.2d 399, 402 (1985) (internal citations and quotation marks omitted). We consider, in particular, the requirements for recognizing liability of professionals to third parties that New York courts have developed in the analogous context of negligent misrepresentation claims.

To meet these requirements, as set out in *Credit Alliance Corp. v. Arthur Anderson & Co.*, 65 N.Y.2d 536 (1985), and ultimately derived from *Glanzer v. Shepard*, 233 N.Y. 236 (1922) (Cardozo, C.J.), and *Ultramares Corp. v. Touche*, 255 N.Y. 170 (1931) (Cardozo, C.J.), a plaintiff must establish that (1) the defendant had awareness that its work was to be used for a particular purpose; (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance. *Credit Alliance*, 65 N.Y.2d at 551.[8] The New York Court of Appeals has described this burden as requiring the

---

[8] *Credit Alliance* dealt specifically with the potential liability for negligent misrepresentation of accountants, but the New York Court of Appeals has since made clear that the *Credit Alliance* doctrine applies to professionals more generally. *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 424 (1989).

28

plaintiff to demonstrate a relationship between plaintiff and defendant that is "so close as to approach that of privity, if not completely one with it." *Id.* at 550 (emphasis omitted) (quoting *Ultramares*, 255 N.Y. at 182-83). Put another way, plaintiff must show that the benefit to the non-party was the "end and aim of the transaction." *Id.* at 549 (emphasis omitted) (quoting *Glanzer*, 233 N.Y. at 238-39). In short, a plaintiff that can satisfy these requirements will, we think, also be within the limits established under New York law for tort claims sounding in negligence that are brought by non-privy third parties.

Here, Bayersiche has plausibly alleged facts sufficient to meet the test of *Credit Alliance* and its precursors. As discussed above, the Amended Complaint alleges, in effect, that Aladdin was aware that its work as Portfolio Manager would be relied on by Bayerische, a non-party to the contract. Before Bayerische invested in the CDO, Aladdin met with Bayersiche at its offices in New York to explain the many ways that Aladdin, as Portfolio Manager, would competently and effectively protect Bayerische's interests as investors in the Aladdin CDO. Bayerische alleges that it relied on these representations, and the PMA, in protecting its interests. In such reliance, Bayerische committed to a $60 million investment, or 60% of the total value of the CDO. The Amended Complaint thus plausibly alleges facts evincing Aladdin's understanding that Noteholders would rely on Aladdin's care and competence in managing the Reference Portfolio.

Aladdin maintains, however, that Bayerische fails to satisfy the criteria set out by then-Chief Judge Cardozo in the seminal case of *Ultramares Corp. v. Touche*, 255 N.Y. 170. We are not persuaded. In *Ultramares*, the defendants were accountants who had prepared and certified a balance sheet for a rubber-importing business. *Id.* at 173. The rubber-importing business

29

borrowed money to finance its purchases of rubber from the plaintiff, who requested a certified balance sheet before it would provide the loan. *Id.* at 175. After the rubber-importing business went bankrupt, the plaintiff sued the accountants for negligently certifying the balance sheet. *Id.* at 175-76. Chief Judge Cardozo concluded that the accountants could not be held to have a duty to anyone who relied on the rubber-importing company's balance sheet, as the "the indeterminate class of persons who, presently or in the future, might deal with the [rubber-importing company] in reliance on the audit" did not have a relationship with the accountants that approached privity. *Id.* at 183. This was because "the service was primarily for the benefit of the [rubber] company, a convenient instrumentality for use in the development of the business, and only incidentally or collaterally for the use of those to whom [the company] might exhibit it." *Id.*

By contrast, Chief Judge Cardozo noted, in *Glanzer v. Shepard* (in which he had previously established a basis for finding a duty in tort to a third-party), "the service rendered by the defendant . . . was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee." *Id.* (citing *Glanzer*, 233 N.Y. 236). Likewise, in this case there was allegedly no service being provided to the formal promissee (the Issuer), which was merely a shell entity. To the contrary, Aladdin is alleged to have been aware that its management of the Reference Portfolio would run specifically to the benefit of Bayerische, which Aladdin solicited to invest in the CDO. The "end and aim" of the PMA was to install Aladdin as the manager of the Reference Portfolio, on behalf of the Noteholders, and as relevant here, to Bayerische in particular.

30

We acknowledge that this is not quite as close as the relationship in *Glanzer*. Bayerische had already purchased the Notes, and was free to sell its Notes on the secondary market (subject to specific transfer restrictions), and the Offering Circular indicated that Goldman would make efforts to list the CDO on the Irish Stock Exchange, further increasing the liquidity of the Notes such that they could be resold to investors beyond those Aladdin specifically solicited, such as Bayersiche.[9] Even so, it is clear that Bayerische has properly alleged that (1) Aladdin was aware that the PMA had the particular purpose of installing Aladdin as the Portfolio Manager to manage the Reference Portfolio on behalf of the Noteholders; (2) Bayerische was known to Aladdin and relied on Aladdin to perform its obligations pursuant to the PMA; and (3) Aladdin's conduct in soliciting Bayerische's investment and its representation that it would manage the CDO in Bayerische's favor evinced an understanding by Aladdin that Bayerische would rely on its performance. Thus, Bayerische has properly alleged a relationship between Aladdin and the Noteholders sufficiently close that recognizing a duty running from Aladdin to Bayerische would not offend the limitations imposed by New York law on tort liability to non-privy third parties.

Finally, Aladdin argues that, even if such a relationship exists, the Noteholders have failed to allege facts that plausibly show Aladdin's conduct amounted to gross negligence. Again, we disagree.

---

[9] We note that while the total number of Notes offered was also limited, and thus potential Noteholders were not entirely "indefinite," as would be the potential number of people shown a balance sheet by a business, we are not convinced that a secondary investor would be "known" to Aladdin in advance such that a secondary Noteholder could bring the claim asserted by Bayerische here. *See White v. Guarente*, 43 N.Y.2d 356, 361 (1977) (holding that actual limited partners in hedge fund were a "known group possessed of vested rights, marked by a definable limit and made up of certain components," but distinguishing them from "prospective limited partners, unknown at the time and who might be induced to join"). That case, in any event, is not before us.

On a motion to dismiss, a claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at \*12 (S.D.N.Y. Mar. 17, 2009) (quoting *AT&T v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996)). Recklessness in the context of a gross negligence claim means "an extreme departure from the standards of ordinary care," such that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (internal quotation mark omitted).

It is true that many of Bayerische's allegations in the Amended Complaint, standing alone, fail to meet this high bar. The allegations about how Aladdin added specific Reference Entities to the Reference Portfolio that were "recklessly" exposed to the housing market and that experienced Credit Events appear to be pleading gross negligence by hindsight. *Cf. Novak v. Kasaks*, 216 F. 3d 300, 309 (2d Cir. 2000) ("[W]e have refused to allow plaintiffs to proceed with allegations of fraud by hindsight. Corporate officials need not be clairvoyant . . . ." (internal citation and quotation marks omitted)); *Mosher-Simons v. County of Allegany*, No. 94–CV–374S, 1997 WL 662512, at \*6 (W.D.N.Y. Oct. 8, 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) (holding plaintiff cannot plead gross negligence through hindsight). Nor do such allegations suggest that defendant engaged in an "extreme departure from the standards of ordinary care." Even accepting that Aladdin's trading caused Bayerische's Notes to default, Bayerische does not allege what, at the time, Aladdin did in selecting these Reference Entities that was an "extreme departure from the standards of ordinary care," rather than simply a bad

bet. Aladdin had discretionary authority to manage the Reference Portfolio in accordance with the trading restrictions. An investment — particularly the kind of complex derivative instrument in which Bayerische, a sophisticated financial institution, invested — is not a guarantee of a risk-free return. Simply adding the conclusory word "reckless" to Aladdin's trading does not transform an ill-advised investment decision into something approaching *intentional* misconduct.

Some of Bayerische's more specific allegations, however, are sufficient to allege gross negligence by Aladdin. The most egregious allegation that appears to "smack" of intentional wrongdoing is that the defendant added Reference Entities to the Reference Portfolio at spreads that were substantially below the then-prevailing market spreads. Bayerische alleges that, over four days in November 2007, defendant added Reference Entities at average spreads of between 409 and 482 basis points, when the "objective, market-based spread for that time period was approximately 516.9 basis points."[10] Additionally, Bayerische alleges that defendant failed to adjust the subordination levels to reflect the risk the market had priced (greater than 500 basis points), and instead used the below-market spreads to adjust subordination. In essence, Bayerische alleges that "[b]ecause Defendant accepted spreads that were well below then-prevailing market spreads, the Reference Portfolio acquired greater risk and received less protection through subordination than it should have had."

Defendant's conduct in these regards may plausibly be said to have been an extreme departure from the standard of ordinary care, most obviously because there is no apparent reason why defendant would want to take this risk, especially since Bayerische alleges that the CDO

---

[10] 100 basis points equals one percent. So a Reference Entity with a "bid side" spread of 500 basis points would mean that a protection buyer (*i.e.* GSCM) seeking to be paid $100 if the Reference Entity defaulted (or otherwise experienced a Credit Event), would need to pay $5 per year, or 5% interest, to the protection seller (*i.e.* the Noteholders) on that $100 of protection.

was created with trading restrictions that were supposed to prevent defendant from adding Reference Entities to the Reference Portfolio with spreads of greater 500 basis points. Accepting below-market spreads with a below-market subordination adjustment appears to have allowed defendant to bypass the trading restrictions designed to protect Bayerische and keep the Reference Portfolio oriented on investment-grade Reference Entities.

Furthermore, accepting below-market spreads on risky Entities appears to have been contrary to how defendant explicitly represented it would manage the portfolio on behalf of the Noteholders. The stated objective of Aladdin's role as Portfolio Manager, according to the PMA, was to "minimize the occurrence" of any losses to the Noteholders. PMA § 2(i). Further, in the marketing presentation Goldman and Aladdin pitched to Bayerische in New York, Aladdin represented that, although its "typical trading [for the Portfolio] is defensive . . . . Aladdin can also take a view on a credit by taking out a tight spread name and replacing it with a wider name . . . where Aladdin believes that the new credit is trading wider than is reflected by the fundamental credit risk. These trades will result in an increase in subordination." *See* Decl. of Jason Mogel in Opp'n to Mot. to Dismiss, 11-cv-673, Doc. 23, Ex. C, at 38 (June 17, 2011). In effect, the representation was that where Aladdin believed the market spread for a given Entity was too high, it could substitute that Entity into the Reference Portfolio, thus increasing Bayerische's protection from default (by increasing subordination at the market spread), without a proportional increase in riskiness (given the difference between the market spread and what Aladdin thought the proper spread should be). But, according to Bayerische's allegations, here, Aladdin did the exact opposite. By substituting Reference Entities at a spread *below* the market spread, Aladdin increased what the market would have perceived as the riskiness of the

34

Reference Portfolio without a proportional increase in protection to the Noteholders through subordination. Even if Aladdin had thought these Entities were not as risky as the market spread suggested, adding them to the Reference Portfolio did not give Bayerische any corresponding benefit through increased subordination. By adding these Entities to the Reference Portfolio at a below market spread, Aladdin in effect transferred the benefits of any bet on the market overpricing the riskiness of the Reference Entities from the Noteholders to GSCM, the Swap Counterparty.

The PMA outlines the specific trading procedures for swapping Reference Entities. First, Aladdin was to propose adding a new Reference Entity to the Portfolio. GSCM, the Swap Counterparty, would provide in good faith what it thought was the appropriate and commercially reasonable spread for the Reference Entity. Aladdin could either accept GSCM's spread or seek a market quotation spread from a neutral "Reference Dealer," which would be binding on Goldman. Once the trade was completed, GSCM would make the appropriate adjustments to the Noteholders' subordination levels that reflected the change in the riskiness of the Reference Portfolio, but Aladdin had the responsibility to challenge GSCM on behalf of Noteholders when GSCM acted improperly. Throughout this pricing and subordination adjustment procedure, it was Aladdin's role to protect the Noteholders' interests vis-à-vis their adverse counterparty, GSCM. Further, given that Bayerische alleges that the market based spreads were in fact *above* the 500 basis point trading restriction, it is reasonable to infer these were particularly risky trades in the context of the overall CDO that would demand some level of heightened scrutiny on the part of Aladdin.

35

Admittedly, Bayersiche does not allege with particularity what the source of an objective market-based spread would be. Bayerische also does not allege whether Aladdin ever challenged GSCM's pricing on the Reference Entities, or made any efforts to confirm that the spreads were reasonably tied to the market spread through the Reference Dealer procedures outlined in the PMA. But this is not a claim for fraud, which pursuant to Federal Rule of Civil Procedure 9(b), would require Bayerische to plead with particularity. Fed. R. Civ. P. 9(b). Rather, gross negligence and breach of contract claims fall under Rule 8(a), and thus require only a "short and plain statement of the claim," so long as the facts alleged and any reasonable inferences that can be drawn in Bayerische's favor give rise to a plausible claim for relief. Fed. R. Civ. P. 8(a); *see Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 437 (S.D.N.Y. 2010) (noting gross negligence claims not subject to the heightened pleadings standards for fraud claims (citing *Iqbal*, 556 U.S. at 678)). Here, the allegations do just that.

Bayersiche alleges further facts that, when taken together with all reasonable inferences in Bayerische's favor, are sufficient to allege a claim for gross negligence, even if they might not be sufficient standing alone. Specifically, plaintiffs allege that Aladdin "tripled down" when adding Icelandic bank debt to the Reference Portfolio, *i.e.*, adding two more Icelandic bank Reference Entities to the existing Icelandic bank in the Reference Portolio, which exposed the Noteholders to the entirety of the Icelandic bank industry at a time when there was an abundance of information regarding the deteriorating position of these banks and the risks associated with them. Bayersiche alleges that this concentration in one small country and one specific industry was contrary to Aladdin's representation that it would maintain a diverse portfolio to avoid multiple credit events. When all three banks failed in October 2008, thus sustaining Credit

36

Events, Bayerische alleges that the losses from these entities represented more than a quarter of Bayerische's loss of subordination that led to the loss of its entire investment.

Defendant argues that the express terms of the transaction documents did not prohibit such an industry or geographic concentration. But Bayersiche alleges that no reasonable portfolio manager would triple down on such Entities when it was managing the portfolio to avoid Credit Events. Bayerische is not required to show a violation of the trading restrictions in order to plausibly allege that Aladdin acted recklessly in how it managed the portfolio. *See Ambac Assurance UK Ltd. v. J.P. Morgan Inv. Mgmt., Inc.*, 88 A.D.3d 1, 10 (1st Dep't 2011) ("Action or non-action in accordance with a provision that *limits* rather than mandates certain actions does not immunize defendant from a breach of contract claim . . . .").

Defendant also argues, relying on two decisions in litigation arising out of Bernard Madoff's Ponzi scheme, that Bayerische's failure to plead that defendant was aware of Bayerische's alleged "red flags" means the gross negligence claim must be dismissed. *See Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 75-76 (S.D.N.Y. 2010); *Baker v. Andover Assocs. Mgmt. Corp.*, 924 N.Y.S.2d 307 (TABLE), 2009 WL 7400085, at *20 (Sup. Ct. 2009). But the complaint in this case is subject to the requirements only of Fed. R. Civ. P. 8, not Rule 9 or the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4; and one can reasonably infer from the allegations that the concerns surrounding certain risky Reference Entities were publically-known, and that the sophisticated investment managers at Aladdin were aware of those concerns and invested in those Entities anyway, notwithstanding Aladdin's commitment to manage the Reference Portfolio so as to avoid Credit Events. We note that Bayerische alleges that had Aladdin simply left the original Reference Portfolio as it was, Bayerische would not have lost its investment.

37

Bayerische also alleges that Aladdin failed to manage the Portfolio in its favor because it failed to establish the short portfolio that could have been used to further increase Bayerische's subordination and protect it from losing its principal if a Credit Event occurred. By itself, this allegation does not suggest recklessness or intentional wrongdoing. There easily may have been a legitimate investment reason for not establishing the short portfolio (*e.g.*, reducing interest payments to Noteholders). Alternatively, it could have been merely an oversight that did not amount to gross negligence. But although this allegation is insufficient by itself, it can be aggregated with the other allegations described above. Taking the allegations as a whole and drawing all reasonable inferences in Bayerische's favor, we conclude that Bayerische has sufficiently alleged facts plausibly suggesting Aladdin abandoned its role to manage the Reference Portfolio in favor of the Noteholders. *Cf. Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 80 A.D.3d 293, 304-05 (1st Dep't 2010), *aff'd on other grounds*, 18 N.Y.3d 341 (2011) (holding as sufficient to survive motion to dismiss plaintiff's claim for gross negligence alleging that JP Morgan knowingly invested in risky mortgage-backed securities despite stated investment goal of "high level of safety of capital" and that JP Morgan favored other client over plaintiff in so investing).

After discovery, the facts that come to light may show a different story. But at this preliminary motion-to-dismiss stage, drawing all inferences in Bayerische's favor, Bayerische has plausibly alleged that Aladdin's gross negligence exposed Bayerische to greater risk that it would lose its entire investment than would have otherwise been the case.

For all the foregoing reasons, we **REVERSE** the district court's Judgment and Orders granting Aladdin's motion to dismiss Bayerische's Amended Complaint and denying Bayerische's motion for reconsideration, and **REMAND** the case to the district court for further proceedings consistent with this Opinion.